# UNITED STATES RAILROAD RETIREMENT BOARD
## *v.* FRITZ

No. 79–870.   Argued October 6, 1980—Decided December 9, 1980

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Powell, JJ., joined.

STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 180. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 182.

*Edwin S. Kneedler* argued the cause for appellant. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Geller, Dale G. Zimmerman, Edward S. Hintzke,* and *James E. Lanter.*

*Daniel P. Byron* argued the cause for appellee. With him on the brief were *Phillip A. Terry* and *Gill Deford.**

JUSTICE REHNQUIST delivered the opinion of the Court.

The United States District Court for the Southern District of Indiana held unconstitutional a section of the Railroad Retirement Act of 1974, 88 Stat. 1305, as amended, 45 U. S. C. § 231 *et seq.,* and the United States Railroad Retirement Board has appealed to this Court pursuant to 28 U. S. C. § 1252. We noted probable jurisdiction. 444 U. S. 1069 (1980).

The 1974 Act fundamentally restructured the railroad retirement system. The Act's predecessor statute, adopted in 1937, provided a system of retirement and disability benefits for persons who pursued careers in the railroad industry. Under that statute, a person who worked for both railroad and nonrailroad employers and who qualified for railroad retirement benefits and social security benefits, 42 U. S. C. § 401 *et seq.,* received retirement benefits under both systems and an accompanying "windfall" benefit.[1] The legislative

---

*Briefs of *amici curiae* urging reversal were filed by *Richard T. Conway* for the National Railway Labor Conference; and by *Edward D. Friedman* for the Railway Labor Executives Association.

Briefs of *amici curiae* urging affirmance were filed by *Jonathan A. Weiss* for Legal Services for the Elderly; and by *Steven F. Bright* and *Gary E. Smith* for T. W. Smith et al.

[1] Under the old Act, as under the new, an employee who worked 10 years in the railroad business qualified for railroad retirement benefits. If the employee also worked outside the railroad industry for a sufficient

history of the 1974 Act shows that the payment of windfall benefits threatened the railroad retirement system with bankruptcy by the year 1981.[2] Congress therefore determined to place the system on a "sound financial basis" by eliminating future accruals of those benefits.[3] Congress also enacted

---

enough time to qualify for social security benefits, he qualified for dual benefits. Due to the formula under which those benefits were computed, however, persons who split their employment between railroad and nonrailroad employment received dual benefits in excess of the amount they would have received had they not split their employment. For example, if 10 years of either railroad or nonrailroad employment would produce a monthly benefit of $300, an additional 10 years of the same employment at the same level of creditable compensation would not double that benefit, but would increase it by some lesser amount to say $500. If that 20 years of service had been divided equally between railroad and nonrailroad employment, however, the social security benefit would be $300 and the railroad retirement benefit would also be $300, for a total benefit of $600. The $100 difference in the example constitutes the "windfall" benefit. See generally, S. Rep. No. 93–1163, pp. 2–3 (1974); H. R. Rep. No. 93–1345, pp. 2–3 (1974).

[2] The relevant Committee Reports stated: "Resolution of the so called 'dual benefit' problem is central both to insuring the fiscal soundness of the railroad retirement system and to establishing equitable retirement benefits for all railroad employees." S. Rep. No. 93–1163, supra, at 11; H. R. Rep. No. 93–1345, supra, at 11. The reason for the problem was that a financial interchange agreement entered into in 1951 between the social security and railroad systems caused the entire cost of the windfall benefits to be borne by the railroad system, not the social security system. The annual drain on the railroad system amounted to approximately $450 million per year, and if it were not for "the problem of dual beneficiaries, the railroad retirement system would be almost completely solvent." S. Rep. No. 93–1163, supra, at 8; H. R. Rep. No. 93–1345, supra, at 7.

[3] S. Rep. No. 93–1163, supra, at 1; H. R. Rep. No. 93–1345, supra, at 1. Congress eliminated future accruals of windfall benefits by establishing a two-tier system for benefits. The first tier is measured by what the social security system would pay on the basis of combined railroad and nonrailroad service, while the second tier is based on railroad service alone. However, both tiers are part of the railroad retirement system, rather than the first tier being placed directly under social security, and

various transitional provisions, including a grandfather provision, § 231b (h),[4] which expressly preserved windfall benefits for some classes of employees.

the benefits actually paid by social security on the basis of nonrailroad employment are deducted so as to eliminate the windfall benefit.

The Railroad Retirement Act of 1974 had its origins in 1970 when Congress created the Commission on Railroad Retirement to study the actuarial soundness of the railroad retirement system. The Commission submitted its report in 1972 and identified "dual benefits and their attendant windfalls" as a principal cause of the system's financial difficulties. It also found that windfall benefits were inequitable, favoring those employees who split their employment over those employees who spent their entire career in the railroad industry. Report of the Commission on Railroad Retirement, The Railroad Retirement System: Its Coming Crisis, H. R. Doc. No. 92–350 (1972). It therefore recommended that future accruals of windfall benefits be eliminated by the establishment of a two-tier system, somewhat similar to the type of system eventually adopted by Congress. It also recommended that "legally vested rights of railroad workers" be preserved. An employee who was fully insured under both the railroad and social security systems as of the changeover date (*i. e.,* by having at least 10 years of railroad employment and the requisite length of social security employment) was deemed to have "legally vested rights."

Following receipt of the Commission's report, Congress requested members of management, labor, and retirees to form a Joint Labor Management Railroad Retirement Negotiating Committee (hereinafter referred to as the Joint Committee) and submit a report, "tak[ing] into account" the recommendations of the Commission. The Joint Committee outlined its proposals in the form of a letter to Congress, dated April 10, 1974. 120 Cong. Rec. 18391–18392 (1974). Although it agreed with the Commission that future accruals of windfall benefits be eliminated, it differed as to the protection to be afforded those already statutorily entitled to benefits and recommended the transitional provisions that were eventually adopted by Congress. A bill embodying those principles was drafted and submitted to Congress, where the relevant committees held lengthy hearings and submitted detailed Reports. See S. Rep. No. 93–1163, *supra;* H. R. Rep. No. 93–1345, *supra.*

[4] Section 3 (h) of the Railroad Retirement Act of 1974, 88 Stat. 1323, 45 U. S. C. § 231b (h), provides in pertinent part:

"(1) The amount of the annuity . . . of an individual who (A) will have (i) rendered service as an employee to an employer, or as an em-

In restructuring the Railroad Retirement Act in 1974, Congress divided employees into various groups. *First,* those employees who lacked the requisite 10 years of railroad employment to qualify for railroad retirement benefits as of January 1, 1975, the changeover date, would have their retirement benefits computed under the new system and would not receive any windfall benefit. *Second,* those individuals already retired and already receiving dual benefits as of the changeover date would have their benefits computed under the old system and would continue to receive a windfall benefit.[5] *Third,* those employees who had qualified for both railroad and social security benefits as of the changeover date, but who had not yet retired as of that date (and thus were

ployee representative, during the calendar year 1974, or (ii) had a current connection with the railroad industry on December 31, 1974, or at the time his annuity under section 2 (a)(1) of this Act began to accrue, or (iii) completed twenty-five years of service prior to January 1, 1975, and (B) will have (i) completed ten years of service prior to January 1, 1975, and (ii) been permanently insured under the Society Security Act on December 31, 1974, shall be increased by an amount equal to [the amount of windfall dual benefit he would have received prior to January 1, 1975] . . . .

"(2) The amount of the annuity . . . to an individual who (A) will not have met the conditions set forth in subclause (i), (ii), or (iii) of clause (A) of subdivision (1) of this subsection, but (B) will have (i) completed ten years of service prior to January 1, 1975, and (ii) been permanently insured under the Social Security Act as of December 31 of the calendar year prior to 1975 in which he last rendered service as an employee to an employer, or as an employee representative, shall be increased by an amount equal to the amount . . . [of windfall benefit calculated at time he left the railroad service] . . . ."

The relevant Committee Reports stated that the most "difficult problem" was the "manner in which dual benefits should be phased out on an equitable basis." S. Rep. No. 93–1163, *supra,* at 11; H. R. Rep. No. 93–1345, *supra,* at 11.

[5] 88 Stat. 1353, see note following 45 U. S. C. § 231. The transition provisions in Title II of the bill are not included in the United States Code. The windfall amount for retired employees is preserved by §§ 204 (a)(3) and (4) of the Act.

not yet receiving dual benefits), were entitled to windfall benefits if they had (1) performed some railroad service in 1974 or (2) had a "current connection" with the railroad industry as of December 31, 1974,[6] or (3) completed 25 years of railroad service as of December 31, 1974. 45 U. S. C. § 231b (h)(1). *Fourth,* those employees who had qualified for railroad benefits as of the changeover date, but lacked a current connection with the railroad industry in 1974 and lacked 25 years of railroad employment, could obtain a lesser amount of windfall benefit if they had qualified for social security benefits as of the year (prior to 1975) they left railroad employment. 45 U. S. C. § 231b (h)(2).[7]

Thus, an individual who, as of the changeover date, was unretired and had 10 years of railroad employment and sufficient nonrailroad employment to qualify for social security benefits is eligible for the full windfall amount if he worked for the railroad in 1974 or had a current connection with the railroad as of December 31, 1974, or his later retirement date. But an unretired individual with 24 years of railroad service and sufficient nonrailroad service to qualify for social security benefits is not eligible for a full windfall amount unless he worked for the railroad in 1974, or had a current connection with the railroad as of December 31, 1974, or his later retirement date. And an employee with 10 years of railroad employment who qualified for social security benefits only after

---

[6] The term "current connection" is defined in 45 U. S. C. § 231 (o) to mean, in general, employment in the railroad industry in 12 of the preceding 30 calendar months.

[7] The amount of the "windfall component" is greater under subsection (1) than under subsection (2) of 45 U. S. C. § 231b (h). The former consists of benefits computed on the basis of social security service through December 31, 1974, while the latter is computed on the basis of social security service only through the year in which the individual left the railroad industry. The difference corresponds to the different dates by which the retired employee must have been permanently insured under the Social Security Act in order to be eligible for any windfall benefit.

leaving the railroad industry will not receive a reduced windfall benefit while an employee who qualified for social security benefits prior to leaving the railroad industry would receive a reduced benefit. It was with these complicated comparisons that Congress wrestled in 1974.

Appellee and others filed this class action in the United States District Court for the Southern District of Indiana, seeking a declaratory judgment that 45 U. S. C. § 231b (h) is unconstitutional under the Due Process Clause of the Fifth Amendment because it irrationally distinguishes between classes of annuitants.[8] The District Court eventually certified a class of all persons eligible to retire between January 1, 1975, and January 31, 1977, who were permanently insured under the Social Security Act as of December 31, 1974, but who were not eligible to receive any "windfall component" because they had left the railroad industry before 1974, had no "current connection" with it at the end of 1974, and had less than 25 years of railroad service.[9] Appellee contended below that it was irrational for Congress to have drawn a distinction between employees who had more than 10 years but less than 25 years of railroad employment simply on the basis of whether they had a "current connection" with the

---

[8] Although "the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider* v. *Rusk,* 377 U. S. 163, 168 (1964). Thus, if a federal statute is valid under the equal protection component of the Fifth Amendment, it is perforce valid under the Due Process Clause of that Amendment. *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971).

[9] It is somewhat unclear precisely who is and is not within the class certified by the District Court. By its terms, the class certified by the District Court would appear to include those employees who qualified for reduced windfall benefits under § 231b (h)(2) by reason of their qualifying for social security benefits as of the year they left the railroad industry. It appears, however, that the District Court intended to include in the class only those, like appellee Fritz, who subsequently qualified for social security benefits and who are therefore ineligible for even the reduced windfall benefit.

railroad industry as of the changeover date or as of the date of retirement.

The District Court agreed with appellee that a differentiation based solely on whether an employee was "active" in the railroad business as of 1974 was not "rationally related" to the congressional purposes of insuring the solvency of the railroad retirement system and protecting vested benefits. We disagree and reverse.

The initial issue presented by this case is the appropriate standard of judicial review to be applied when social and economic legislation enacted by Congress is challenged as being violative of the Fifth Amendment to the United States Constitution. There is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time. *Hisquierdo* v. *Hisquierdo,* 439 U. S. 572, 575 (1979); *Flemming* v. *Nestor,* 363 U. S. 603, 608–611 (1960). And because the distinctions drawn in § 231b (h) do not burden fundamental constitutional rights or create "suspect" classifications, such as race or national origin, we may put cases involving judicial review of such claims to one side. *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1 (1973); *Vance* v. *Bradley,* 440 U. S. 93 (1979).

Despite the narrowness of the issue, this Court in earlier cases has not been altogether consistent in its pronouncements in this area. In *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78–79 (1911), the Court said that "[w]hen the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time that the law was enacted must be assumed." On the other hand, only nine years later in *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920), the Court said that for a classification to be valid under the Equal Protection Clause of the Fourteenth

Amendment it "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation . . . ."

In more recent years, however, the Court in cases involving social and economic benefits has consistently refused to invalidate on equal protection grounds legislation which it simply deemed unwise or unartfully drawn.

Thus in *Dandridge* v. *Williams,* 397 U. S. 471 (1970), the Court rejected a claim that Maryland welfare legislation violated the Equal Protection Clause of the Fourteenth Amendment. It said:

> "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago,* 228 U. S. 61, 68–70. . . .
>
> . . . "[The rational-basis standard] is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy." *Id.,* at 485–486.

Of like tenor are *Vance* v. *Bradley, supra,* at 97, and *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976). Earlier, in *Flemming* v. *Nestor, supra,* at 611, the Court upheld the constitutionality of a social security eligibility provision, saying:

> "[I]t is not within our authority to determine whether the Congressional judgment expressed in that Section is sound or equitable, or whether it comports well or ill with

purposes of the Act. . . . The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom."

And in a case not dissimilar from the present one, in that the State was forced to make a choice which would undoubtedly seem inequitable to some members of a class, we said:

"Applying the traditional standard of review under [the Equal Protection Clause], we cannot say that Texas' decision to provide somewhat lower welfare benefits for [Aid to Families with Dependent Children] recipients is invidious or irrational. Since budgetary constraints do not allow the payment of the full standard of need for all welfare recipients, the State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living. While different policy judgments are of course possible, it is not irrational for the State to believe that the young are more adaptable than the sick and elderly, especially because the latter have less hope of improving their situation in the years remaining to them. Whether or not one agrees with this state determination, there is nothing in the Constitution that forbids it." *Jefferson* v. *Hackney,* 406 U. S. 535, 549 (1972).

Applying those principles to this case, the plain language of § 231b (h) marks the beginning and end of our inquiry.[10]

---

[10] This opinion and JUSTICE BRENNAN's dissent cite a number of equal protection cases including *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 (1911); *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412 (1920); *Morey* v. *Doud,* 354 U. S. 457 (1957); *Flemming* v. *Nestor,* 363 U. S. 603 (1960); *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307 (1976); *New Orleans* v. *Dukes,* 427 U. S. 297 (1976); *Johnson* v. *Robison,* 415 U. S. 361 (1974); *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528 (1973); *U. S. Dept. of Agriculture* v. *Murry,* 413 U. S. 508 (1973); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); and *James* v. *Strange,* 407

There Congress determined that some of those who in the past received full windfall benefits would not continue to do so. Because Congress could have eliminated windfall benefits for all classes of employees, it is not constitutionally impermissible for Congress to have drawn lines between groups of employees for the purpose of phasing out those benefits. *New Orleans* v. *Dukes, supra,* at 305.

The only remaining question is whether Congress achieved its purpose in a patently arbitrary or irrational way. The classification here is not arbitrary, says appellant, because it is an attempt to protect the relative equities of employees and to provide benefits to career railroad employees. Congress fully protected, for example, the expectations of those employees who had already retired and those unretired employees who had 25 years of railroad employment. Conversely, Congress denied all windfall benefits to those employees who lacked 10 years of railroad employment. Congress additionally provided windfall benefits, in lesser amount, to those employees with 10 years' railroad employment who had qualified for social security benefits at the time they had left railroad em-

---

U. S. 128 (1972). The most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles. And realistically speaking, we can be no more certain that this opinion will remain undisturbed than were those who joined the opinion in *Lindsley, supra, Royster Guano Co., supra,* or any of the other cases referred to in this opinion and in the dissenting opinion. But like our predecessors and our successors, we are obliged to apply the equal protection component of the Fifth Amendment as we believe the Constitution requires and in so doing we have no hesitation in asserting, contrary to the dissent, that where social or economic regulations are involved *Dandridge* v. *Williams,* 397 U. S. 471 (1970), and *Jefferson* v. *Hackney,* 406 U. S. 535 (1972), together with this case, state the proper application of the test. The comments in the dissenting opinion about the proper cases for which to look for the correct statement of the equal protection rational-basis standard, and about which cases limit earlier cases, are just that: comments in a dissenting opinion.

ployment, regardless of a current connection with the industry in 1974 or on their retirement date.

Thus, the only eligible former railroad employees denied full windfall benefits are those, like appellee, who had no statutory entitlement to dual benefits at the time they left the railroad industry, but thereafter became eligible for dual benefits when they subsequently qualified for social security benefits. Congress could properly conclude that persons who had actually acquired statutory entitlement to windfall benefits while still employed in the railroad industry had a greater equitable claim to those benefits than the members of appellee's class who were no longer in railroad employment when they became eligible for dual benefits. Furthermore, the "current connection" test is not a patently arbitrary means for determining which employees are "career railroaders," particularly since the test has been used by Congress elsewhere as an eligibility requirement for retirement benefits.[11] Congress could assume that those who had a current connection with the railroad industry when the Act was passed in 1974, or who returned to the industry before their retirement, were more likely than those who had left the industry prior to 1974 and who never returned, to be among the class of persons who pursue careers in the railroad industry, the class for whom the Railroad Retirement Act was designed. *Hisquierdo* v. *Hisquierdo,* 439 U. S., at 573.

[11] The "current connection" test has been used since 1946 as an eligibility requirement for both occupational disability and survivor annuities, 45 U. S. C. §§ 231a (a)(1)(iv), 231a (d)(1) (ch. 709, §§ 203, 205, 213, 60 Stat. 726–735), and it has been used since 1966 in determining eligibility for a supplemental annuity. 45 U. S. C. § 231a (b)(1). (Pub. L. 89–699, § 1, 80 Stat. 1073.)

Appellee contends that the "current connection" test is impermissible because it draws a distinction not on the duration of employment but rather on the time of employment. But this Court has clearly held that Congress may condition eligibility for benefits such as these on the character as well as the duration of an employee's ties to an industry. *Mathews* v. *Diaz,* 426 U. S. 67, 83 (1976).

Where, as here, there are plausible reasons for Congress' action, our inquiry is at an end. It is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," *Flemming* v. *Nestor,* 363 U. S., at 612, because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing. The "task of classifying persons for . . . benefits . . . inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line," *Mathews* v. *Diaz,* 426 U. S. 67, 83–84 (1976), and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

Finally, we disagree with the District Court's conclusion that Congress was unaware of what it accomplished or that it was misled by the groups that appeared before it. If this test were applied literally to every member of any legislature that ever voted on a law, there would be very few laws which would survive it. The language of the statute is clear, and we have historically assumed that Congress intended what it enacted. To be sure, appellee lost a political battle in which he had a strong interest, but this is neither the first nor the last time that such a result will occur in the legislative forum. What we have said is enough to dispose of the claims that Congress not only failed to accept appellee's argument as to restructuring *in toto,* but that such failure denied him equal protection of the laws guaranteed by the Fifth Amendment.[12]

---

[12] As we have recently stated: "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979) (footnote omitted).

For the foregoing reasons, the judgment of the District Court is

*Reversed.*

JUSTICE STEVENS, concurring in the judgment.

In my opinion JUSTICE BRENNAN's criticism of the Court's approach to this case merits a more thoughtful response than that contained in footnote 10, *ante,* at 176–177. JUSTICE BRENNAN correctly points out that if the analysis of legislative purpose requires only a reading of the statutory language in a disputed provision, and if any "conceivable basis" for a discriminatory classification will repel a constitutional attack on the statute, judicial review will constitute a mere tautological recognition of the fact that Congress did what it intended to do. JUSTICE BRENNAN is also correct in reminding us that even though the statute is an example of "social and economic legislation," the challenge here is mounted by individuals whose legitimate expectations of receiving a fixed retirement income are being frustrated by, in effect, a breach of a solemn commitment by their Government. When Congress deprives a small class of persons of vested rights that are protected—and, indeed, even enhanced [1]—for others who are in a similar though not identical position, I believe the Constitution requires something more than merely a "conceivable" or a "plausible" explanation for the unequal treatment.

I do not, however, share JUSTICE BRENNAN's conclusion that every statutory classification must further an objective that can be confidently identified as the "actual purpose" of the legislature. Actual purpose is sometimes unknown. Moreover, undue emphasis on actual motivation may result in identically worded statutes being held valid in one State and invalid in a neighboring State.[2] I therefore believe that we

---

[1] The 1974 Act provided increased benefits for spouses, widows, survivors, and early retirees. See 45 U. S. C. § 231c (g).

[2] Compare *Rundlett* v. *Oliver,* 607 F. 2d 495 (CA1 1979) (upholding Maine's statutory rape law), with *Meloon* v. *Helgemoe,* 564 F. 2d 602

must discover a correlation between the classification and either the actual purpose of the statute or a legitimate purpose that we may reasonably presume to have motivated an impartial legislature. If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect. If, however, the adverse impact may reasonably be viewed as an acceptable cost of achieving a larger goal, an impartial lawmaker could rationally decide that that cost should be incurred.

In this case we need not look beyond the actual purpose of the legislature. As is often true, this legislation is the product of multiple and somewhat inconsistent purposes that led to certain compromises. One purpose was to eliminate in the future the benefit that is described by the Court as a "windfall benefit" and by JUSTICE BRENNAN as an "earned dual benefit." That aim was incident to the broader objective of protecting the solvency of the entire railroad retirement program. Two purposes that conflicted somewhat with this broad objective were the purposes of preserving those benefits that had already vested and of increasing the level of payments to beneficiaries whose rights were not otherwise to be changed. As JUSTICE BRENNAN emphasizes, Congress originally intended to protect all vested benefits, but it ultimately sacrificed some benefits in the interest of achieving other objectives.

Given these conflicting purposes, I believe the decisive questions are (1) whether Congress can rationally reduce the vested benefits of some employees to improve the solvency of the entire program while simultaneously increasing the benefits of others; and (2) whether, in deciding which vested benefits to reduce, Congress may favor annuitants whose railroad service was more recent than that of disfavored annuitants who had an equal or greater quantum of employment.

(CA1 1977), cert. denied, 436 U. S. 950 (1978) (striking down New Hampshire's statutory rape law).

My answer to both questions is in the affirmative. The congressional purpose to eliminate dual benefits is unquestionably legitimate; that legitimacy is not undermined by the adjustment in the level of remaining benefits in response to inflation in the economy. As for the second question, some hardship—in the form of frustrated long-term expectations—must inevitably result from any reduction in vested benefits. Arguably, therefore, Congress had a duty—and surely it had the right to decide—to eliminate no more vested benefits than necessary to achieve its fiscal purpose. Having made that decision, any distinction it chose within the class of vested beneficiaries would involve a difference of degree rather than a difference in entitlement. I am satisfied that a distinction based upon currency of railroad employment represents an impartial method of identifying that sort of difference. Because retirement plans frequently provide greater benefits for recent retirees than for those who retired years ago—and thus give a greater reward for recent service than for past service of equal duration—the basis for the statutory discrimination is supported by relevant precedent. It follows, in my judgment, that the timing of the employees' railroad service is a "reasonable basis" for the classification as that term is used in *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, *ante,* at 174, and *Dandridge* v. *Williams,* 397 U. S. 471, *ante,* at 175, as well as a "ground of difference having a fair and substantial relation to the object of the legislation," as those words are used in *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, *ante,* at 174–175.

Accordingly, I concur in the judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Appellee Gerhard Fritz represents a class of retired former railroad employees who were statutorily entitled to Railroad Retirement and Social Security benefits, including an overlap herein called the "earned dual benefit," until enactment of

the Railroad Retirement Act of 1974, which divested them of their entitlement to the earned dual benefit. The Act did not affect the entitlements of other railroad employees with equal service in railroad and nonrailroad jobs, who can be distinguished from appellee class only because they worked at least one day for, or retained a "current connection" with, a railroad in 1974.

The only question in this case is whether the equal protection component of the Fifth Amendment [1] bars Congress from allocating pension benefits in this manner. The answer to this question turns in large part on the way in which the strictures of equal protection are conceived by this Court. See *Morey* v. *Doud,* 354 U. S. 457, 472 (1957) (Frankfurter, J., dissenting). The parties agree that the legal standard applicable to this case is the "rational basis" test. The District Court applied this standard below, see Conclusion of Law No. 7, reprinted at App. to Juris. Statement 28a. The Court today purports to apply this standard, but in actuality fails to scrutinize the challenged classification in the manner established by our governing precedents. I suggest that the mode of analysis employed by the Court in this case virtually immunizes social and economic legislative classifications from judicial review.

## I

A legislative classification may be upheld only if it bears a rational relationship to a legitimate state purpose. *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979); *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 312 (1976) (*per curiam*); *New Orleans* v. *Dukes,* 427 U. S. 297, 303 (1976) (*per curiam*). Perhaps the clearest statement of this Court's present approach to "rational basis" scrutiny may be found in *Johnson* v. *Robison,* 415 U. S. 361 (1974). In considering the constitutionality of limitations on the availability of edu-

---

[1] See *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638, n. 2 (1975).

cational benefits under the Veterans' Readjustment Benefits Act of 1966, eight Members of this Court agreed that

> "our analysis of the classification proceeds on the basis that, although an individual's right to equal protection of the laws 'does not deny . . . the power to treat different classes of persons in different ways[;] . . . [it denies] the power to legislate that different treatment be accorded the persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. *A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."* ' " *Id.*, at 374–375 (quoting *Reed* v. *Reed,* 404 U. S. 71, 75–76 (1970), which in turn was quoting *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920)) (ellipses and brackets in original) (emphasis supplied).

The enactments of Congress are entitled to a presumption of constitutionality, and the burden rests on those challenging a legislative classification to demonstrate that it does not bear the "fair and substantial relation to the object of the legislation," *ibid.*, required under the Constitution. *Mathews* v. *Lucas,* 427 U. S. 495, 510 (1976).

Nonetheless, the rational-basis standard "is not a toothless one," *ibid.*, and will not be satisfied by flimsy or implausible justifications for the legislative classification, proffered after the fact by Government attorneys. See, *e. g., Jimenez* v. *Weinberger,* 417 U. S. 628 (1974); *U. S. Dept. of Agriculture* v. *Moreno,* 413 U. S. 528 (1973); *U. S. Dept. of Agriculture* v. *Murry,* 413 U. S. 508 (1973); *James* v. *Strange,* 407 U. S. 128 (1972). When faced with a challenge to a legislative classification under the rational-basis test, the court should ask, first, what the purposes of the statute are, and, second, whether the classification is rationally related to achievement of those purposes.

## II

The purposes of the Railroad Retirement Act of 1974 are clear, because Congress has commendably stated them in the House and Senate Reports accompanying the Act. A section of the Reports is entitled "Principal Purpose of the Bill." It notes generally that "[t]he bill provides for a complete restructuring of the Railroad Retirement Act of 1937, and will place it on a sound financial basis," [2] and then states:

"Persons who already have vested rights under both the Railroad Retirement and the Social Security systems will in the future be permitted to receive benefits computed under both systems just as is true under existing law." H. R. Rep. No. 93–1345, pp. 1, 2 (1974); S. Rep. No. 93–1163, pp. 1, 2 (1974).[3]

Moreover, Congress explained that this purpose was based on considerations of fairness and the legitimate expectations of the retirees:

"[A]ny plan to eliminate these dual benefits should include protection of the equities of existing beneficiaries

---

[2] Of course, the legitimate governmental interest in restoring the Railroad Retirement system to fiscal soundness does not, in itself, serve to support the challenged classification in this case. At issue is why Congress discriminated among two classes of railroad retirees. The overall interest in saving money is irrelevant to this discrimination.

[3] Several pages later, the Reports again make clear that persons with vested rights to earned dual benefits would retain them:

"It must be recognized that the bill actually takes benefits away from certain railroad employees—those who have not already qualified for Social Security benefits." H. R. Rep. No. 93–1345, at 6; S. Rep. No. 93–1163, at 7.

Only in technical discussions and in the section-by-section analyses do the Reports reflect the actual consequences of the Act on the appellee class. See H. R. Rep. No. 93–1345, at 12, 39–40; S. Rep. No. 93–1163, at 12, 38–39.

The administration also understood the Act to preserve rights to vested earned dual benefits. See H. R. Rep. No. 93–1345, at 81–82 (supplemental report from the Office of Management and Budget).

and employees with claims upon such benefits. Dual beneficiaries cannot fairly be criticized, since they have merely secured the benefits to which they are entitled under existing law. That is why their equities should be preserved." H. R. No. 93–1345, at 11; S. Rep. No. 93–1163, at 11.

Thus, a "principal purpose" of the Railroad Retirement Act of 1974, as explicitly stated by Congress, was to preserve the vested earned benefits of retirees who had already qualified for them. The classification at issue here, which deprives some retirees of vested dual benefits that they had earned prior to 1974, directly conflicts with Congress' stated purpose. As such, the classification is not only rationally unrelated to the congressional purpose; it is inimical to it.

### III

The Court today avoids the conclusion that § 231b (h) must be invalidated by deviating in three ways from traditional rational-basis analysis. First, the Court adopts a tautological approach to statutory purpose, thereby avoiding the necessity for evaluating the relationship between the challenged classification and the legislative purpose. Second, it disregards the actual stated purpose of Congress in favor of a justification which was never suggested by any Representative or Senator, and which in fact conflicts with the stated congressional purpose. Third, it upholds the classification without any analysis of its rational relationship to the identified purpose.

### A

The Court states that "the plain language of [45 U. S. C.] § 231b (h) marks the beginning and end of our inquiry." *Ante,* at 176. This statement is strange indeed, for the "plain language" of the statute can tell us only what the classification is; it can tell us nothing about the purpose of the classification, let alone the relationship between the classification

and that purpose. Since § 231b (h) deprives the members of appellee class of their vested earned dual benefits, the Court apparently assumes that Congress must have *intended* that result. But by presuming purpose from result, the Court reduces analysis to tautology. It may always be said that Congress intended to do what it in fact did. If that were the extent of our analysis, we would find every statute, no matter how arbitrary or irrational, perfectly tailored to achieve its purpose. But equal protection scrutiny under the rational-basis test requires the courts first to deduce the independent objectives of the statute, usually from statements of purpose and other evidence in the statute and legislative history, and second to analyze whether the challenged classification rationally furthers achievement of those objectives. The Court's tautological approach will not suffice.

## B

The Court analyzes the rationality of § 231b (h) in terms of a justification suggested by Government attorneys, but never adopted by Congress. The Court states that it is " 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.' " *Ante,* at 179 (quoting *Flemming* v. *Nestor,* 363 U. S. 603, 612 (1960)). In fact, however, equal protection analysis has evolved substantially on this question since *Flemming* was decided. Over the past 10 years, this Court has frequently recognized that the actual purposes of Congress, rather than the *post hoc* justifications offered by Government attorneys, must be the primary basis for analysis under the rational-basis test. In *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648, n. 16 (1975), we said:

> "This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation." (Citing cases.)

Thus, in *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 17 (1973), this Court stated that a challenged classification will pass muster under "rational basis" scrutiny only if it "rationally furthers some legitimate, *articulated* state purpose" (emphasis added), and in *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S., at 314, we stated that such a classification will be sustained only if it "rationally furthers the purposes *identified by the State."* (Emphasis added.) Moreover, in *Johnson* v. *Robison,* 415 U. S., at 381–382, we upheld a classification on the finding that "[t]hese quantitative and qualitative distinctions, *expressly recognized by Congress,* form a rational basis for Congress' classification . . . ." (Emphasis added.) See also *Califano* v. *Goldfarb,* 430 U. S. 199, 212–213 (1977).

From these cases and others it is clear that this Court will no longer sustain a challenged classification under the rational-basis test merely because Government attorneys can suggest a "conceivable basis" upon which it might be thought rational. The standard we have applied is properly deferential to the Legislative Branch: where Congress has articulated a legitimate governmental objective, and the challenged classification rationally furthers that objective, we must sustain the provision. In other cases, however, the courts must probe more deeply. Where Congress has expressly stated the purpose of a piece of legislation, but where the challenged classification is either irrelevant to or counter to that purpose, we must view any *post hoc* justifications proffered by Government attorneys with skepticism. A challenged classification may be sustained only if it is rationally related to achievement of an *actual* legitimate governmental purpose.

The Court argues that Congress chose to discriminate against appellee for reasons of equity, stating that "Congress could properly conclude that persons who had actually acquired statutory entitlement to windfall benefits while still employed in the railroad industry had a greater equitable

claim to those benefits than the members of appellee's class who were no longer in railroad employment when they became eligible for dual benefits." [4] *Ante,* at 178. This statement turns Congress' assessment of the equities on its head. As I have shown,[5] Congress expressed the view that it would be inequitable to deprive any retirees of any portion of the benefits they had been promised and that they had earned under prior law. See also H. R. Rep. No. 93–1345, pp. 4, 11 (1974); S. Rep. No. 93–1163, pp. 4, 11 (1974); 120 Cong. Rec. 35613 (1974) (statement of Rep. Hudnut); *id.,* at 35614 (statement of Rep. Shuster); *id.,* at 35615 (statement of Rep. Morgan). The Court is unable to cite even one statement in the legislative history by a Representative or Senator that makes the equitable judgment it imputes to Congress. In the entire legislative history of the Act, the only persons to state that the equities justified eliminating appellee's earned dual benefits were representatives of railroad management and labor, whose self-serving interest in bringing about this result destroys any basis for attaching weight to their statements.[6]

The factual findings of the District Court concerning the development of § 231b (h), amply supported by the legislative history, are revealing on this point.[7] In 1970, Congress

---

[4] The Court's quoted justification fails on its face to support the challenged classification. Despite the Court's apparent belief to the contrary, some members of the appellee class did "actually acquir[e] statutory entitlement" to dual benefits while still employed in the railroad industry, see *ante,* at 178, but nevertheless were deprived of a portion of those benefits. See § 231b (h)(2). Under the Court's own reasoning, therefore, these persons were arbitrarily and impermissibly treated.

[5] See *supra,* at 185–186.

[6] See discussion following, *infra.*

[7] The Court does not claim that the District Court's factual findings were clearly erroneous, though it does state its disagreement with one lower court conclusion. See *ante,* at 179. Therefore, the factual findings of the District Court govern the litigation in this Court, and in any event, are amply supported by the record.

established a Commission to investigate the actuarial soundness of the Railroad Retirement system and to make recommendations for its reform. See Pub. L. 91–377, 84 Stat. 791. The Commission was composed of one railroad management representative, one railroad labor representative, and three public representatives. The Commission submitted a report in 1972, recommending, *inter alia,* that railroad retirees in the future no longer be permitted to earn full Railroad Retirement and Social Security benefits without offset. The Commission insisted, however, that

> "[i]ndividuals who have vested rights to social security benefits by virtue of permanently or fully insured status, but cannot exercise them because they are not at retirement age under railroad retirement, should be guaranteed an equivalent right in dollar terms to the staff tier portion of their benefits, including vested dual benefits . . . ." Commission on Railroad Retirement, The Railroad Retirement System: Its Coming Crisis, H. R. Doc. No. 92–350, p. 368 (1972).

After receiving the Commission report, Congress asked railroad management and labor representatives to negotiate and submit a bill to restructure the Railroad Retirement system, which should "take into account the specific recommendations of the Commission on Railroad Retirement." Pub. L. 93–69, § 107, 87 Stat. 165. The members of this Joint Labor-Management Negotiating Committee were not appointed by public officials, nor did they represent the interests of the appellee class, who were no longer active railroaders or union members.[8]

---

[8] The use of a Joint Labor-Management Negotiating Committee to draft legislation concerning the Railroad Retirement system was not novel. In fact, such a committee drafted the original Railroad Retirement Act of 1937 and several amending Acts since then. See *Hisquierdo* v. *Hisquierdo,* 439 U. S. 572, 574, n. 3 (1979); Railroad Retirement Act—Supplemental Benefits, Hearings on H. R. 17285 before the Subcommittee on Com-

In an initial proposed restructuring of the system, the Joint Committee devised a means whereby the system deficit could be completely eliminated without depriving retirees of vested earned benefits. See Finding of Fact No. 43, reprinted at App. to Juris. Statement 12a. However, labor representatives demanded that benefits be increased for their current members, the cost to be offset by divesting the appellee class of a portion of the benefits they had earned under prior law. See Findings of Fact Nos. 39, 40, 44, reprinted *id.*, at 11a–12a. As the District Court found:

> "Essentially, the railroad labor negotiators traded off the plaintiff class of beneficiaries to achieve added benefits for their current employees, even though doing so violated the basic Congressional purposes of the negotiations. Furthermore, by sacrificing the plaintiff class, the railroad labor unions breached the duty of fair representation they owed to the plaintiff class, which duty resulted from the labor unions' purported representation of the plaintiff class' interests in the [Joint Committee] negotiations." Finding of Fact No. 44, reprinted *id.*, at 12a–13a.

Congress conducted hearings to consider the Joint Committee's recommendations, but never directed its attention to their effect on persons in appellee class' situation. In fact, the Joint Committee negotiators and Railroad Retirement Board members who testified at congressional hearings perpetuated the inaccurate impression that all retirees with earned vested dual benefits under prior law would retain their benefits unchanged. For example, Mr. William H. Dempsey, chairman of the management negotiators on the Joint

---

merce and Finance of the House Committee on Interstate and Foreign Commerce, 89th Cong., 2d Sess., 2–3 (1966); Railroad Retirement, Hearings on H. R. 1362 before the House Committee on Interstate and Foreign Commerce, 79th Cong., 1st Sess., 448 (1945); Commission on Railroad Retirement, The Railroad Retirement System: Its Coming Crisis, H. R. Doc. No. 92–350, p. 147 (1972).

Committee and principal witness at the hearings, told the committee:

> "[P]rotection [will] be accorded to people who are on the rolls now receiving dual benefits and those who are vested under both systems as of January 1, 1975, the idea of the Commission being, and we agree with this, that these individuals had a right to rely upon the law as it existed when they were working. They have made their contributions. They have relied upon the law. They . . . should be protected." Restructuring of the Railroad Retirement System: Hearings on H. R. 15301 before the House Committee on Interstate and Foreign Commerce, 93d Cong., 2d Sess., 214 (1974).

Accord, *id.*, at 190 (statement of Mr. Dempsey); *id.*, at 194 (statement of Mr. Dempsey); *id.*, at 204 (statement of Rep. Dingell); *id.*, at 213–214 (statement of Mr. Dempsey); *id.*, at 242 (statement of Mr. Dempsey); *id.*, at 248 (statement of Mr. James L. Cowen, Chairman of the Railroad Retirement Board); *id.*, at 249 (statement of Mr. Cowen); *id.*, at 335 (statements of Messrs. Neil P. Speirs and Wythe D. Quarles, Jr., members of the Railroad Retirement Board); *id.*, at 351 (statement of Mr. Speirs).

Most striking is the following colloquy between Representative Dingell and Mr. Dempsey:

> "Mr. DINGELL. Who is going to be adversely affected? Somebody has to get it in the neck on this. Who is going to be that lucky fellow?
>
> "Mr. DEMPSEY. Well, I don't think so really. I think this is the situation in which every one wins. Let me explain.
>
> .     .     .     .     .
>
> "Mr. DINGELL. Mr. Dempsey, I see some sleight of hand here but I don't see how it is happening. I applaud it but I would like to understand it. My problem is that you are going to go to a realistic system that is going

to cost less but pay more in benefits. Now if you have accomplished this, I suggest we should put you in charge of the social security system." *Id.*, at 199, 201.

The Act was passed in the form drafted by the Joint Committee without any amendment relevant to this case.[9]

Of course, a misstatement or several misstatements by witnesses before Congress would not ordinarily lead us to conclude that Congress misapprehended what it was doing. In this instance, however, where complex legislation was drafted by outside parties and Congress relied on them to explain it, where the misstatements are frequent and unrebutted, and where no Member of Congress can be found to have stated the effect of the classification correctly, we are entitled to suspect that Congress may have been misled. As the District Court found: "At no time during the hearings did Congress even give a hint that it understood that the bill by its language eliminated an earned benefit of plaintiff's class." Finding of Fact No. 63, reprinted at App. to Juris. Statement 22a.

Therefore, I do not think that this classification was rationally related to an *actual* governmental purpose.

## C

The third way in which the Court has deviated from the principles of rational-basis scrutiny is its failure to analyze

---

[9] Congress' unfortunate tendency to pass Railroad Retirement legislation drafted by labor and management representatives without adequate scrutiny was criticized by the Commission on Railroad Retirement in its 1972 report:

"The historical record shows that past policy formulation has not always abided by the key criteria of equity and sound financing. Generally the major provisions of the system have been the product of negotiations between railway labor and the carriers in a bargaining process often reflecting conflicts or the exercise of power in an industry which directly affects the public welfare. The results of this bargaining process have, at times, been less than fully screened by the Federal Government before they were ratified by Congressional action and given Presidential approval." H. R. Doc. No. 92–350, *supra*, at 147.

whether the challenged classification is genuinely related to the purpose identified by the Court. Having suggested that "equitable considerations" underlay the challenged classification—in direct contradiction to Congress' evaluation of those considerations, and in the face of evidence that the classification was the product of private negotiation by interested parties, inadequately examined and understood by Congress— the Court proceeds to accept that suggestion without further analysis.

An unadorned claim of "equitable" considerations is, of course, difficult to assess. It seems to me that before a court may accept a litigant's assertion of "equity," it must inquire what principles of equity or fairness might genuinely support such a judgment. But apparently the Court does not demand such inquiry, for it has failed to address any equitable considerations that might be relevant to the challenged classification.

In my view, the following considerations are of greatest relevance to the equities of this case: (1) contribution to the system; (2) reasonable expectation and reliance; (3) need; and (4) character of service to the railroad industry. With respect to each of these considerations, I would conclude that the members of appellee class have as great an equitable claim to their earned dual benefits as do their more favored co-workers, who remain entitled to their earned dual benefits under § 231b (h).

*Contribution to the system.* The members of the appellee class worked in the railroad industry for more than 10 but fewer than 25 years, and also worked in nonrailroad jobs for the required number of years for vesting under Social Security—usually 40 quarters. During that time, they contributed to both the Railroad Retirement and Social Security systems, and met all requirements of the law for the vesting of benefits under those systems. In this respect, they are identical to their more favored co-workers, who contributed no more of their earnings to the systems than did appellee

class. On the basis of contributions to the systems, therefore, there is no reason for this discrimination.

*Reasonable expectation and reliance.* Throughout their working lives, the members of appellee class were assured that they would receive retirement benefits in accordance with the terms of the law as it then stood. See Finding of Fact No. 70, reprinted at App. to Juris. Statement 25a. No less than their more favored co-workers, they chose career paths and made calculations for their retirement based on these assurances. For Congress to change its rules and strip them of these benefits at the time of their retirement seems decidedly inequitable. As the District Court found:

> "The class' reliance on the earned railroad retirement benefit and on the anticipated receipt of full dual benefits is clear from the evidence adduced herein.
>
> .        .        .        .        .
>
> "Equally clear from the evidence is the fact that the class' reliance has been to the class' detriment. Class members have been forced to alter substantially their mode of retirement living due to the drastic reduction of Railroad Retirement benefits worked by the 1974 Act. This point was confirmed in the [Joint Committee] negotiations shortly prior to the sending of its report to Congress in April, 1974: 'Mr. Dempsey: . . . The benefit [dual benefit] is one that if we were starting out we would not have at all. So theoretically we would urge that it be out completely as of January 1, 1975. But we cannot do that—we have people who are relying on benefits, not responsible for them but merely working for them under the rules as they stood.' " Findings of Fact Nos. 70, 71, reprinted *id.*, at 25a–26a.

In fact, this reliance was one of the principal reasons Congress resolved not to disturb the vested earned dual benefits of retirees.[10]

---

[10] Cf. *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U. S. 359,

*Need.* The appellee class is composed of fixed-income elderly people, no longer capable of re-entering the work force to reacquire benefits once earned but now lost. The average loss to the class members is about $88 per month, no small element in the monthly budget. The record provides no reason to suppose that members of the appellee class are any less likely to be in need than are their co-workers.

*Character of service to the railroad industry.* Members of the appellee class worked at least 10 years for the railroad industry by 1974, and many of them worked as long as 24 years. Their duration of railroad employment—surely the best measure of their service to the industry—was equal to that of their co-workers. In fact, some members of the class worked *over twice as long* in the railroad industry as did some of those who retained their rights to a dual benefit. Finding of Fact No. 60, reprinted *id.,* at 21a–22a. Admittedly, the members of the appellee class retired from railroad work prior to 1974, but the record shows that many left railroad work involuntarily, not because of a lack of commitment to the industry. Finding of Fact No. 72, reprinted *id.,* at 26a. Moreover, since one purpose of the Railroad Retirement system was to encourage railroad workers to retire early, so as to create positions for younger workers, *Hisquierdo* v. *Hisquierdo,* 439 U. S. 572, 573–574 (1979), it is hardly fair to fault the appellee class now for having done so.

Even if I were able to accept the notion that Congress considered it equitable to deprive a class of railroad retirees of a portion of their vested earned benefits because they no longer worked for the railroad, I would still consider the means adopted in § 231b (h) irrational.[11] Under this provision, a

---

374 (1980) (one of Congress' central purposes in passing the Employee Retirement Income Security Act was "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated" (footnote omitted)).

[11] Contrary to the Court's suggestion, this is not a "line-drawing" case, where the Congress must make a division at some point along an ad-

retiree is favored by retention of his full vested earned benefits if he had worked so much as one day for a railroad in 1974. This is a plainly capricious basis for distinguishing among retirees, every one of whom had worked in the industry for at least *10 years:* the fortuity of one day of employment in a particular year should not govern entitlement to benefits earned over a lifetime.[12]

I therefore conclude that the Government's proffered justification of "equitable considerations," accepted without question by the Court, cannot be defended. Rather, as the legislative history repeatedly states, equity and fairness demand that the members of appellee class like their co-workers, retain the vested dual benefits they earned prior to 1974. A conscientious application of rational-basis scrutiny demands, therefore, that § 231b (h) be invalidated.

## IV

Equal protection rationality analysis does not empower the courts to second-guess the wisdom of legislative classifications. On this we are agreed, and have been for over 40 years. On the other hand, we are not powerless to probe beneath claims by Government attorneys concerning the means and ends of

---

mittedly rationally conceived continuum. See *ante,* at 179. Here, Congress has isolated a particular class of retirees on the basis of a distinction that is utterly irrelevant to any actual or legitimate governmental purpose.

[12] The wholly arbitrary nature of this classification is highlighted by an analysis of the exception in § 231 (h) (2). Under this subsection, some members of the appellee class are entitled to retain a portion of their earned dual benefit, albeit at a reduced level, while the others are divested of the dual benefit altogether. The basis for this added twist is the timing of their qualification for Railroad Retirement and Social Security. Those who qualified for Social Security first retain a portion of their dual benefit; those who qualified for Railroad Retirement first do not. Needless to say, the retirees had no notice at the time that the timing of qualification would make any difference to their entitlement to benefits. This kind of after-the-fact shifting of the rules for retirement benefits has not been justified and cannot be justified.

Congress.   Otherwise, we would defer not to the considered judgment of Congress, but to the arguments of litigators. The instant case serves as an example of the unfortunate consequence of such misplaced deference.   Because the Court is willing to accept a tautological analysis of congressional purpose, an assertion of "equitable" considerations contrary to the expressed judgment of Congress, and a classification patently unrelated to achievement of the identified purpose, it succeeds in effectuating neither equity nor congressional intent.

I respectfully dissent.