**Emily R. THURMOND, Individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**John R. BLOCK, Secretary of Agriculture for the United States of America; and Marguerite Sallee, Commissioner of the Tennessee Department of Human Services; Defendants.**

No. 85–1172.

United States District Court, W.D. Tennessee, E.D.

June 13, 1986.

Leland Dale Wilson, West Tenn. Legal Services, Dyersburg, Tenn., for plaintiff.

Richard Willard, Asst. Atty. Gen., W. Hickman Ewing, Jr., U.S. Atty., Alice Howze, Asst. U.S. Atty., Memphis, Tenn., Sheila Lieber and Don J. Moss, Attys., Dept. of Justice, Civ. Div., Washington, D.C., for Mr. Block.

W.J. Michael Cody, Atty. Gen., Jim G. Creecy, Chief Deputy Atty. Gen., Dianne Stamey, Asst. Atty. Gen., Nashville, Tenn., for Ms. Sallee.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS

TODD, District Judge.

Plaintiff Emily R. Thurmond filed this action on August 19, 1985, alleging that the Food Stamp Act, 7 U.S.C. § 2011 *et seq.*, as it applies to her, is unconstitutional. Purporting to represent a class of persons similarly affected by the allegedly unconstitutional provision of the act, plaintiff named as defendants the Secretary of Agri-culture for the United States and the Commissioner of Tennessee's Department of Human Services, the agency responsible for implementing the act in Tennessee. The federal defendant has moved to dismiss the complaint on the ground that it fails to state a claim for which relief may be granted. For the reasons set forth herein, that motion is granted.

## I.

In consideration of this motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, all well plead allegations of the complaint must be assumed to be true and construed in a light most favorable to the plaintiff, the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *L'Orange v. Medical Protective Co.,* 394 F.2d 57, 59 (6th Cir.1968).

Plaintiff is a resident of the McKinney-Baker Home, a group home in Union City, Tennessee, licensed by the state as a supportive living facility for persons with mental disabilities. The home has ten residents, all of whom suffer some degree of mental disability and are recipients of benefits under either Title II or Title XVI of the Social Security Act. According to plaintiff, the McKinney-Baker Home is the only such home in the county in which she lives and one of only five in the entire northwest portion of Tennessee.

The McKinney-Baker Home began operation in July 1984 in the form of a proprietorship owned by Peggy McKinney. Plaintiff became a resident of the home in August 1984. Each resident, including plaintiff, pays the home $290 per month for room and board and other services. In plaintiff's case, this amount is supplied by her sole source of income, her monthly Supplemental Security Income (SSI) benefits. The home receives an additional $150 per resident each month pursuant to a contract with the Northwest Tennessee Mental Health Center.

In April 1985 the home was incorporated as McKinney-Baker, Inc., a private, for

profit Tennessee corporation. According to plaintiff, the home's incorporation had no effect on the daily operations of the home, the services received by its residents, or the amount charged the residents for those services. The complaint does not state why the home was incorporated, although an amendment to the complaint alleges that most group homes in Tennessee that "incorporated for profit did so because of misunderstandings over the nature of non-profit corporations and a fear by the individual sponsors that they would lose ownership of their homes." Amended Complaint, ¶ 39A.

The home's residents began to receive food stamp assistance when the home opened in July 1984. Each resident's food stamps were received by Pansy Baker, the home's "sponsor," who would then purchase food supplies and prepare meals for the residents. On June 17, 1985, the Tennessee Department of Human Services sent notices to the residents that they were no longer eligible for food stamps due to the home's inability to produce evidence that it was a nonprofit institution. None of the residents received food stamps after June 30, 1985.

According to the complaint, "loss of the food stamps has created a crisis at the McKinney-Baker Home." Complaint, ¶ 30. The funds received from the residents and the mental health center are alleged by plaintiff to be insufficient to cover all costs of maintaining the home. Because the residents are on fixed incomes, the monthly rate the home charges them allegedly cannot be raised. Plaintiff alleges that no federal or state assistance is available for the home and, unless the residents are again given food stamps, the home may be forced to close.

Plaintiff brought this action on behalf of herself and other residents of group homes in Tennessee she alleges to be similarly situated. In support of that allegation, plaintiff alleges that there are approximately 1,500 persons such as herself in Tennessee who live in about 190 group homes similar in operation to the McKin-ney-Baker Home. Each home allegedly houses fewer than sixteen residents, with an average of less than eight. Of these 190 homes, plaintiff alleges that less than 10% are operated by for profit corporations. She further alleges that more than 60% are operated by individual sponsors who do not qualify as nonprofit organizations and that the remainder, approximately 30%, are operated by nonprofit corporations.

In spite of the differing business structures, plaintiff alleges that no significant differences exist among the 190 homes. Alleging that all of the homes, regardless of business structure, have similar revenues, assets, and operating expenses, plaintiff contends that "very little, if any, profit" is made by any of the homes. Amended Complaint, ¶ 45. Plaintiff also alleges that there are no significant differences in the incomes and assets of the residents of the different organizational types of homes. Finally, plaintiff alleges that the residents of for profit group homes in Tennessee have the same need for food stamps as residents of nonprofit group homes. Because the latter group is permitted to receive food stamps and the former is not, plaintiff alleges that she and the class she purports to represent are denied equal protection of the law.

On November 4, 1985, the federal defendant filed the present motion to dismiss, alleging that Congress' failure to include for profit institutions in the challenged provision of 7 U.S.C.A. § 2012(i) (West Supp. 1986) is rationally related to legitimate legislative goals of (1) benefiting institutions that serve a purely public purpose, (2) providing food stamps to the neediest individuals, and (3) lessening the risk that for profit institutions would be paid twice for meals provided to their residents. In response to the motion, plaintiff argues that the federal defendant's position is dependent upon a finding that it was reasonable for Congress to presume that residents of nonprofit group homes for the mentally ill are needier than residents of for profit group homes and that nonprofit group homes charge

less than all other group homes. Relying upon allegations in her amended complaint that refute these presumptions, plaintiff asserts that no rational basis exists for the presumptions.

Plaintiff also contends that the legislative history of § 2012(i) contains no evidence of an identifiable purpose for requiring group homes for the mentally ill to be nonprofit institutions. That absence, according to plaintiff, shows that the requirement was not the result of a deliberate and considered choice by Congress. In light of the legislative history of the challenged provision and the allegations of her complaint, plaintiff alleges that the complaint does state a claim upon which relief may be granted and that the motion to dismiss should be denied.

## II.

The "threshold question" in a case attacking a statute on equal protection grounds is to determine "the appropriate level of judicial scrutiny of the [statute's] distinguishing characteristics." *Dillinger v. Schweiker*, 762 F.2d 506, 508 (6th Cir. 1985). Because this case does not involve a suspect class or fundamental right, this Court's review of the challenged legislation is limited to assuring that it "classif[ies] the persons it affects in a manner rationally related to legitimate government objectives." *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). If the legislation is rationally related to such objectives, this Court may not substitute its judgment for that of Congress, the political body elected by the people to make "democratic choices among alternative solutions to social and economic problems." *Id.* 450 U.S. at 230, 234, 101 S.Ct. at 1080, 1082. *See also Dillinger, supra.*

The Food Stamp Act was passed in 1964 "to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households." Food Stamp Act of 1964, Pub.L. No. 88–525, § 2, 78 Stat. 703 (1964) (codified as amended at 7 U.S.C. § 2011). Participation in the food stamp program is limited by 7 U.S.C.A. § 2014 (West Supp.1986), to "households." That term is defined by the act as "(1) an individual who lives alone or who, while living with others, customarily purchases food and prepared meals for home consumption separate and apart from the others, or (2) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption...." 7 U.S.C.A. § 2012(i) (West Supp.1986).

When it was first passed in 1964, the definition of "household" in the Food Stamp Act specifically excluded "residents of an institution or boarding house." Food Stamp Act of 1964, Pub.L. No. 88–525, § 3, 78 Stat. 703, 703 (1964).[1] In 1973, Congress passed the first exceptions to this institutional exclusion, permitting residents of federally subsidized housing for the elderly and alcoholics and narcotics addicts participating in alcohol or drug treatment programs of private nonprofit institutions to be eligible for food stamps. Act of Aug. 10, 1973, Pub.L. No. 93–86, § 3(a), (p), 87 Stat. 221, 246, 249 (1973). The exception for alcohol and drug treatment programs

---

1. As amended, the pertinent part of the definition of "household" in 7 U.S.C.A. § 2012(i) (West Supp.1986) provides that

> In no event shall any individual or group of individuals constitute a household if they reside in an institution or boarding house, or else live with others and pay compensation to the others for meals. For the purposes of this subsection, residents of federally subsidized housing for the elderly, disabled or blind recipients of benefits under Title II or Title XVI of the Social Security Act who are residents in a public or private nonprofit group living arrangement that serves no more than sixteen

residents and is certified by the appropriate State agency or agencies under regulations issued under section 1616(e) of the Social Security Act [42 U.S.C.A. § 1382e(e)], temporary residents of public or private nonprofit shelters for battered women and children, and narcotics addicts or alcoholics who live under the supervision of a private nonprofit institution, or a publicly operated community mental health center, for the purpose of regular participation in a drug or alcoholic treatment program shall not be considered residents of institutions and shall be considered individual households.

was expanded in 1985 to include such programs operated by publicly operated community health centers. Act of Aug. 15, 1985, Pub.L. No. 99–88, Title I, 99 Stat. 293, 297 (1985). An exception for disabled or blind residents of certain public or private nonprofit group homes was added in 1979. Act of Aug. 14, 1979, Pub.L. No. 96–58, § 7, 93 Stat. 389, 392 (1979). In 1980, the fourth exception was added, including battered women and children temporarily living in public or private nonprofit shelters in the definition of "household." Food Stamp Act Amendments of 1980, Pub.L. No. 96–249, § 101, 94 Stat. 357, 357 (1980).

At issue in this case is the exception pertaining to certain disabled or blind individuals who reside in small group homes. Specifically, the act considers

> disabled or blind recipients of benefits under Title II or Title XVI of the Social Security Act who are residents in a *public or private nonprofit group living arrangement* that serves no more than sixteen residents and is certified by the appropriate State agency or agencies under regulations issued under section 1616(e) of the Social Security Act [42 U.S.C.A. § 1382e(e)]

as individual households and thus eligible for food stamp assistance. 7 U.S.C.A. § 2012(i) (West Supp.1986) (emphasis added). Since the group home she resides in is operated by a for profit corporation, plaintiff is not considered by the act as a "household." However, because she alleges that no differences exist between residents of for profit and nonprofit group homes, plaintiff contends that § 2012(i) denies her and the class she purports to represent equal protection of the law.

In order to determine if the challenged part of § 2012(i) is rationally related to a legitimate Congressional purpose, two questions must be answered: "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648,

668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981). As noted above, the state purpose of the Food Stamp Act is to "raise levels of nutrition among low-income households." 7 U.S.C.A. § 2011 (West Supp.1986). To accomplish this purpose, it was necessary for Congress to define the group of persons constituting "low-income households." Plaintiff does not challenge Congress' initial decision to exclude residents of institutions from eligibility for food stamp assistance. She contends, however, that the distinction in the disputed portion of § 2012(i) is not the result of a "deliberate, considered choice," but "the result of inadvertence or ignorance." *Schweiker v. Wilson,* 450 U.S. at 235–36, 101 S.Ct. at 1083.

With regard to that distinction, the legislative history of the amendment adding the exception for certain residents of small group homes does not contain an express purpose for the nonprofit requirement. As such, this Court must "examin[e] the surrounding circumstances, including the legislative history of the statute, and application of logic, to decide whether the legislative classification was a 'deliberate, considered choice' rather than 'the result of inadvertence or ignorance,'...." *Frazier v. Manson,* 703 F.2d 30, 34 (2d Cir.), *cert. denied,* 454 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983) (quoting *Schweiker v. Wilson,* 450 U.S. at 235–36, 101 S.Ct. at 1083). This Court's review of the history of the 1979 amendment reveals that, although no express purpose for the nonprofit requirement was stated, the requirement was not the result of inadvertence or ignorance.

The group home exception was not part of the original Senate bill to amend the Food Stamp Act introduced in 1979, but was a substitute provision offered by Senators Dole and Stafford. During the floor debates, Senator Dole stated that he was "pleased to join [Senator Stafford] in supporting an amendment to extend food stamp benefits to handicapped individuals living in small, *public, nonprofit community living centers.*" 125 Cong.Rec. S20141 (daily ed. July 23, 1979) (emphasis added). Senator Dole also compared the proposed exception to that for narcotics

addicts and alcoholics, stating that "Presently, drug addicts and alcoholics living in treatment centers are allowed to receive food stamps, even though handicapped persons in *comparable living situations* may not receive stamps." *Id.* (emphasis added). In his remarks, Senator Stafford urged his "fellow Senators to join with Senator Dole and I [sic] to provide that qualified recipients of SSI and SSDI residing in group living arrangements be granted *the same privileges of receiving food stamps as accorded drug addicts and alcoholics* under the Food Stamp Act." 125 Cong.Rec. S20147 (daily ed. July 23, 1979) (emphasis added). It is clear from the statements of the amendment's sponsors that the use of the term "nonprofit" was not due to inadvertence.

Plaintiff argues that the fact that the amendment "parroted" the exception for narcotics addicts and alcoholics is evidence of the inadvertent nature of the nonprofit requirement, as opposed to evidencing a deliberate and considered choice. According to plaintiff, the basis for this argument is that the provision for narcotics addicts and alcoholics does not have the statutory limitations contained in the exception for group homes. These limitations were included in the group home exception to insure that the homes met "Federal standards." 125 Cong.Rec. S20142 (daily ed. July 23, 1979) (statement of Sen. Dole). The presence of those limitations in one exception but not others does not necessarily require a finding that Congress did not intend also to limit the type of institution to nonprofit. Indeed, the consistent presence of the nonprofit requirement in the exceptions to the institutional exclusion can only be evidence of a deliberate and considered choice by Congress.

In the absence of an express purpose in the legislative history for the nonprofit requirement in the group home exception, the federal defendant advances three purposes which he alleges Congress may have had when the amendment was passed. The first of those alleged purposes, benefiting institutions that serve a purely public purpose, is not a legitimate purpose for the Food Stamp Act. The stated purpose of the Food Stamp Act is to raise nutrition levels of the poor in this country. The act is thus intended to benefit the poor themselves, not the institutions that serve them.

The other two purposes advanced by Secretary Block are that Congress intended to provide food stamps to the neediest individuals and to lessen the risk that for profit institutions would be paid twice for meals provided to their residents. Based upon the circumstances surrounding the 1979 amendment, this Court finds that Congress could have had these purposes in mind. Because they facially appear to be legitimate, the question becomes whether it was reasonable for Congress to believe that requiring group homes to be nonprofit would promote that purpose. *Western & S. Life Ins. Co., supra.*

In their opposition to the present motion, plaintiff asserts that the answer to this question must be that it was not reasonable. As summarized in Part I, *supra,* plaintiff's complaint alleges that no significant differences exist in the level of need of residents of for profit and nonprofit institutions in Tennessee. Plaintiff also contends that the monthly fee charged to residents of for profit institutions in Tennessee is not significantly different from that charged to residents of nonprofit institutions.

Even if these allegations are true, they do not establish that it was unreasonable for Congress to believe that the nonprofit requirement would result in providing food stamp assistance to the neediest persons and in lessening the risks for double payment. The question is not whether the facts underlying these apparent purposes were correct, but whether those facts "could not reasonably be conceived [by Congress] to be true." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979) (citing *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340 55 L.Ed. 369 (1911).

By their very nature, for profit institutions exist to create profits, nonprofit institutions do not. Thus, it is not unreasonable to believe that for profit group homes charge their residents more for the same

services than nonprofit group homes, with the perceived difference being the profit earned by the for profit institution. It logically follows that persons of less financial means, or the persons most in need of federal assistance, are more likely to use the services of nonprofit group homes. This Court finds, therefore, that it was not unreasonable for Congress to believe that limiting food stamp assistance to residents of nonprofit group homes would serve the neediest persons. Similarly, because it is reasonable to believe that for profit institutions exist to create profits, it is not unreasonable to believe that for profit group homes that received food stamp assistance for their residents would not reduce the fees charged the residents, but would retain any revenues in excess of expenses as profits. Thus, this Court finds that it was not unreasonable for Congress to believe that nonprofit requirement of § 2012(i) would lessen the risk for double payments.

In summary, it appears to this Court that "plausible reasons" for the nonprofit requirement of § 2012(i) exist. *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Because it is " 'constitutionally irrelevant whether this reasoning in fact underlay' " that requirement, this Court's inquiry need go no further. *Id.*, quoting *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).

### III.

■ The right to equal protection is not violated merely by classifications in a statute that are "imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Nor is it unconstitutional to gradually attack a problem when the problem is far reaching and suspect classes or fundamental rights are not implicated. *Id.* at 486–87, 90 S.Ct. at 1162. Even though such an approach may result in some inequities, a legislative classification is not to be judged solely by examining its impact upon the excluded class. *Schweiker v. Hogan*, 457 U.S. 569, 589, 102 S.Ct. 2597, 2609, 73 L.Ed.2d 227 (1982). It is only when the classification, as a whole, is found not to be rationally related to a legitimate legislative purpose that it violates the Equal Protection Clause.

■ In the present case, this Court finds that the nonprofit requirement of 7 U.S.C. § 2012(i) for small group homes serving the handicapped is rationally related to legitimate governmental purposes. Although plaintiff and the class she purports to represent are no doubt poor and in need of food stamp assistance, their remedy lies in Congress, and not in the courts. *Cf. Fritz*, 449 U.S. at 179, 101 S.Ct. at 461; *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 545–46, 93 S.Ct. 2821, 2831–32, 37 L.Ed.2d 782 (1973) (Rehnquist, J., dissenting). Federal defendant's motion to dismiss is, therefore, granted, and this action is dismissed.

IT IS SO ORDERED.