EUROPEAN CONNECTIONS &
TOURS, INC., Plaintiff,

v.

Alberto GONZALES in his Official capacity as Attorney General of the United States and the United States of America, Defendants,

v.

The Tahirih Justice Center,
Defendant–Intervenor.

No. CIVA 1:06CV0426 CC.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 23, 2007.

Ralph S. Goldberg, Law Office of Ralph Goldberg, Decatur, GA, for European Connections & Tours, Inc., Plaintiff.

Alonzo H. Long, Office of United States Attorney, Atlanta, GA, for Alberto Gonzales in his official capacity as Attorney General of the United States, United States of America, Defendants.

Randall K. Miller, Arnold & Porter, LLP, McLean, VA, Ross S. Goldstein, Arnold & Porter, Washington, DC, Randall Marc Hawkins, Jones Day–Atlanta, Atlanta, GA, for Tahirih Justice Center, Intervenor Defendant.

## ORDER

COOPER, District Judge.

This action involves a challenge by Plaintiff European Connections & Tours, Inc. ("Plaintiff" or "European Connections") to the International Marriage Broker Regulation Act of 2005 ("IMBRA"). European Connections challenges IMBRA under the First and Fifth Amendments to the Constitution of the United States. European Connections specifically challenges two portions of the IMBRA statute that relate to (1) the disclosure of background information and (2) the definition of International Marriage Brokers ("IMBs") covered by the Act. First, European Connections claims that IMBRA's requirement that IMBs collect background data from its male clients and furnish this information to the female clients is an infringement of the IMB's "speech" that offends the First Amendment to the United States Constitution. (*See* Complaint ¶¶ 9–10; *see also* Pl.'s Mot. for Temporary Restraining Order at 11–21.) European Connections further alleges that the requirement is an impermissible (1) "prior restraint" on constitutionally protected speech; (ii) "content-based" restriction of First Amendment protected speech; and (iii) regulation of "commercial speech." (*See id.*) European Connections also claims that the background information is more extensive than necessary to achieve Congress' purpose. Second, European Connections asserts that IMBRA's definition of IMB, which includes religious and cultural organizations operating on a non-profit basis, as well as organizations that do not provide international dating services as the "principal" part of its business and operate on an "equal profit" basis (charging comparable rates and offering comparable services to all genders and nationalities), creates distinctions that offend the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

The above-styled action came before the Court on April 3, 2006, for a preliminary injunction hearing. Pursuant to Fed. R.Civ.P. 65(a)(2), and over objections by Defendants Alberto Gonzales and the United States of America and by Defendant–Intervenor The Tahirih Justice Center,[1] the Court consolidated the preliminary injunction hearing with a trial on the merits. Having considered the evidence presented, the oral arguments of counsel, and the proposed findings of fact and conclusions of law submitted by the parties, the Court hereby makes the following findings of fact and conclusions of law.

---

1. Defendants Alberto Gonzales and the United States of America objected on the basis that Plaintiff had not properly served the Complaint. Defendants indicate in their Proposed Findings of Fact and Conclusions of Law, however, that the United States Attorney was served with a copy of the Summons and Complaint on April 21, 2006.

## FINDINGS OF FACT

### I. Parties

#### A. *Plaintiff*

European Connections is a corporation that conducts business at 4080 McGinnis Ferry Road in Alpharetta, Georgia. (Transcript "Tr." at p. 9.)[2] European Connections operates a range of businesses and websites, including *www.russianladies.com*, *www.mailorderbrides.com*, *www.EastWestMatch.com*, and *www.globalladies.com*, which specialize in matchmaking and introduction services between American men and foreign women who are primarily from Eastern Europe and the former Soviet Union. (*Id.* at pp. 11–12; 40–41.) The American men who are clients of European Connections pay a membership fee and other fees in connection with the company's introduction and ancillary services. (*Id.* at p. 53.) Except those women who send e-mail or receive translation services through *www.russianladies.com*, the women do not pay a fee. (*Id.* at pp. 15–16, 53–54.) Until recently, European Connections also operated "romance tours" to enable male clients to travel to meet women in person in their home countries. (*Id.* at pp. 12, 25–26.)

European Connections facilitates contact between men and women by permitting users of certain websites it operates to post personal profiles of themselves, which are available for online review and can include such information as photographs and biographical data. (*Id.* at pp. 10, 40–41.) Contact information is collected from male clients when their credit card is used, but this information is not disclosed by European Connections. (Complaint ¶ 5.) Postal addresses are never collected from female clients. (*Id.*) Telephone numbers and e-mail addresses of female clients are collected from 20% of the female members. (*Id.*) This information is also not disclosed by European Connections. (*Id.*)

European Connections assigns to each male and female user a password, which uniquely identifies the user, is displayed along with the user's personal profile, and may be used to contact the user by e-mail. (Tr. at pp. 10–11.) No other contact information is provided or disseminated by European Connections, except as otherwise stated below. (*Id.* at p. 36.) Male and female users are permitted to browse posted profiles and to communicate with one another by e-mail via European Connections' computer servers. (*Id.* at pp. 10–11.)

For a fee, European Connections also provides a three-way, translator-assisted, international conference call service, paid for by its United States clients, which utilizes the assistance of interpreters and translators who are European Connections' employees. (*Id.* at pp. 19–21; Def.'s Ex. C.) European Connections has eight (8) employees who translate or interpret, all of whom speak Russian and three of whom speak Ukrainian. (Tr. at pp. 20–21.) As part of European Connections' international conference call service, the woman's telephone number may be provided to the United States client if she consents and the call lasts for ten (10) minutes or more. (*Id.* at pp. 19–20; Def.'s Ex. C.)

There are approximately 200 to 250 Russian matchmaking agencies with whom European Connections has business relationships at any given time. (Tr. at pp. 16–18, 28–29.) E-mails between European Connections' United States male clients and its foreign female clients utilizing *www.globalladies.com* are communicated through European Connections' computer servers and

---

**2.** Unless otherwise noted, all transcript references are to the proceeding held on April 3, 2006.

the Russian matchmaking agencies with whom European Connections has business relationships. (Id.) The agencies are paid one dollar for every e-mail received, translated into English by the Russian matchmaking agencies, and delivered to European Connections' female clients. (Id. at pp. 18–19.) The Russian matchmaking agencies are also responsible for translating the foreign women's responses into English and forwarding it to www.globalladies. com. (Id. at p. 18.)

Through its www.k1–marriage–visas. com website, European Connections provides information about the K–1 visa process, which is often referred to as the "marriage visa." (Id. at pp. 21–22; Def.'s Ex. D.) European Connections also markets through its www.k1–marriage–visas. com website a product called the "Fiancée Visa Do–it–Yourself Preparation Kit," which it claims includes all forms necessary to process a K–1 fiancée visa application. (Tr. at pp. 22–23; Def.'s Ex. E.) European Connections' "Fiancée Visa Do–it–Yourself Preparation Kit" also discusses aspects of the K–1 visa process, such as necessary documentation, "substantiating" the relationship, required fees and expenditures, additional steps necessary if the foreign woman has a child, best locations for a medical examination, how to expedite the interview process, list of items the foreign woman must take to her interview at the Embassy, and "[w]hat the lady must say at her fiancée visa interview." (Tr. at pp. 23–24; Def.'s Ex. E.) As part of its "Fiancée Visa Do–it–Yourself Preparation Kit" service, European Connections provides verbal advice on the K–1 visa process both by telephone and in person at its offices. (Tr. at p. 23.)

European Connections also markets through its www.k1–marriage–visas.com website a referral service in which it refers American male clients to one or more immigration attorneys with whom it has ne-gotiated a flat fee of $1,300.00 to provide legal services in connection with the processing of K–1 visa applications. (Id. at pp. 24–25; Def.'s Ex. F.) European Connections derives income through its referral service by receiving $400.00 of the $1,300.00 fee paid in connection with obtaining the services of the immigration attorney. (Id. at pp. 24–25.) In the past four (4) years, European Connections has referred over 2,000 K–1 visa application clients under its immigration attorney referral services, and no application has been denied. (Id. at pp. 31–33; Def.'s Ex. F.)

European Connections formerly promoted tours to Russia for its American male clients through its www.romancetours.com website but is now in the process of discontinuing its tour business. (Tr. at pp. 25–26; Def.'s Ex. G.) European Connections has a business relationship with the operators of www.gotorussia.com, a company that arranges travel to Russia, among other places. (Tr. at pp. 26–27; Def.'s Ex. H.) European Connections derives income through that business relationship. (Id.)

### B. Defendant and Defendant–Intervenor

Defendant Alberto Gonzales is a defendant in his official capacity as Attorney General of the United States. (Compl.) Plaintiff also has separately named the United States of America, a sovereign government, as a defendant. (Id.)

Defendant–Intervenor Tahirih Justice Center ("TJC") is a non-profit organization whose mission is to enable women and girls who face gender-based violence to access justice. (Tr. at pp. 62–63.) TJC engages in immigration services, litigation, public policy advocacy, and education and outreach to ensure systemic change that protects women and girls from violence. (Id.) TJC has represented and currently

represents ten women who came to the United States through IMBs, who were abused by their American husbands. (*Id.* at p. 92.) TJC served as an expert consultant to Congress in its drafting of the federal legislation at issue in this lawsuit. (*Id.* at p. 72.)

## II. Domestic Violence Against Immigrant Women and the IMB Industry in the United States

When an American man wishes to bring a foreign woman to the United States for purposes of marriage, the man must obtain a "K–1 Visa" or a "fiancée visa" pursuant to regulations promulgated under the authority of the United States Department of Homeland Security pursuant to federal statutes enacted by Congress. The legal status of women who emigrate to the United States through the K–1 visa program is generally dependent on the U.S. citizen sponsor. (Tr. at 45.) Unless a waiver is obtained, women who enter the country through the K–1 visa program must return to their countries if they divorce the U.S. sponsor within a two-year period. (*Id.* at pp. 44–45.)

The rates of domestic violence against immigrant women are much higher than those of the U.S. population as a whole and have in common with women brokered through international marriage brokers a number of factors, including the dependency of the immigrant woman on the U.S. citizen for her legal status. (*Id.* at pp. 68–69.) An estimated 70% of abusive U.S. citizen spouses, including those who consummate relationships through IMBs, withhold the filing of the proper paperwork necessary to validate the legal status of their immigrant female partners to cause them to fall out of legal status and to hold the threat of jail or deportation over the woman. (*Id.*) Estimates by the National Institute on Justice are that over 73 percent of domestic violence cases go unreported. (Tr. at pp. 77.)

While many cases do go unreported, there have been notable cases of extreme violence committed by United States citizens toward "mail-order brides." These cases have occurred across the United States, including in the states of Alabama, California, Georgia, Hawaii, Kentucky, Maryland, Minnesota, New Jersey, New York, Pennsylvania, Texas, Virginia, and Washington. 151 Congr. Rec. S 17353 (2005). A review of the details of the cases, as presented to the Senate, indicates that many of the cases involved the drugging, isolation, stalking, sexual abuse, mental abuse, physical abuse, and, in some instances, even the murder of the female, immigrant spouse. *See id.* Furthermore, the United States male perpetrators of these crimes often were involved with multiple foreign women and were seeking to become involved with other foreign women at or around the time they committed the crimes. *See id.*

As will be discussed more extensively herein, the IMB industry has been the subject of extensive study by Congress and scholars, and a growing body of literature describes key attributes of the industry. The IMB industry has grown rapidly in response to increasing demand by some American men for foreign "traditional" wives. (Pl.'s Ex. 2., Robert J. Scholes, *The "Mail–Order Bride" Industry and its Impact on U.S. Immigration,* in Commissioner of the Immigration and Naturalization Service and the Director of the Violence Against Women Office at the Department of Justice, *International Matchmaking Organizations: A Report to Congress* (1999) (hereinafter "Scholes Study") at p. 4.) In 1999, the Immigration and Naturalization Services ("INS") estimated that over 200 U.S.-based businesses paired 4,000–6,000 American men each year with foreign women, primarily from

Asia and Eastern Europe. (Pl.'s Ex. 1,[3] Commissioner of the Immigration and Naturalization Service and the Director of the Violence Against Women Office at the Department of Justice *International Matchmaking Organizations: A Report to Congress* (1999) (hereinafter "INS Report") at p. 7; Scholes Study at p. 2.) By 2004, those figures had more than doubled. *See, e.g.,* Brocato, Vanessa, *"Profitable Proposals: Explaining and Addressing the Mail–Order Bride Industry Through International Human Rights Law."* San Diego Int'l L.J., 2004, at 229. Since 1999, the number of foreign fiancées who came into the United States on the K–1 visa have increased by more than 50 percent, and there has also been a corresponding increase in the number of domestic violence cases involving women brokered through IMBs. (Tr. at pp. 74–75.)

IMBs use websites to market women primarily from developing and economically depressed countries in Asia and Eastern Europe. ·(*See* Pl.'s Ex. 2, Scholes Study at pp. 2–3.) These women typically do not have access to the Internet themselves. (Tr. at pp. 15–16, 70.) These English-language websites are directed to the male client rather than the female recruits, who typically have limited or no English proficiency. (*Id.* at p. 69–70.) IMBs often charge their male clients fees of up to several thousand dollars to gain access to these foreign women. (*Id.* at p. 113.) The profit incentives of IMBs are presently skewed to satisfy the male client rather than to safeguard the women they recruit. (Pl.'s Ex. 1, INS Report at p. 5.)

## III. Past Research and Legislation and Enactment of IMBRA

IMBRA was enacted by Congress to address issues of domestic violence and human trafficking against so-called "mail order brides" who overwhelmingly are female, foreign nationals who emigrate to the United States as the result of having developed personal relationships, facilitated by or through IMBs, with men residing in this country. (Defs.' Exs. I—L.) The enactment of IMBRA is the product of a decade and a half of investigation by Congress into abuses perpetrated by American men against foreign women, described below.

"In 1989, the House Judiciary Committee on Immigration, Refugees and International Law held a hearing on domestic violence in marriages between American citizens and foreigners. Representative Louis M. Slaughter testified that 'many battered conditional residents had no viable legal options.'" (Pl.'s Ex. 2, Scholes Study at p. 11.) As a result, in 1990, Congress passed legislation to provide a unique remedy for battered foreign women known as the "battered spouse waiver." This allows a foreign woman who is in an abusive relationship with a U.S. citizen to leave the relationship and directly petition the immigration authorities for legalization of her status. The battered spouse waiver is an exception or "waiver" from the ordinary rule that a foreign woman's legal status in the United States is dependent upon her U.S.-citizen sponsor. *See* 8 U.S.C. § 1154.

Congress undertook substantial study and investigation in the months and years leading to the enactment of the 1994 Vio-

---

**3.** The Court notes that Plaintiff's Exhibit No. 1 is the same document as Defendant's Exhibit I. For the most part, the Court has cited to Plaintiff's Exhibit No. 1 when referring to the document in this Order because Plaintiff's Exhibit No. 1 contains page numbers at the top right of the document, whereas Defendant's Exhibit I does not contain page numbers.

lence Against Women Act ("VAWA"), 108 Stat. 1296 (1994). Congress noted with concern indications that domestic violence rates could be very high in marriages between alien women and U.S. citizen of lawful permanent resident men. H.R.Rep. No. 103–395, 1993 WL 484760, at *34 (1993). In particular, Congress found that an American man's control over his foreign wife's visa, together with her lack of knowledge about domestic abuse remedies, kept many foreign women locked in abusive relationships:

[A] battered spouse may be deterred from taking action to protect himself or herself, such as filing for a civil protection order, filing criminal charges, or calling the police, because of the threat or fear of deportation. Many immigrant women live trapped and isolated in violent homes, afraid to turn to anyone for help. They fear both continued abuse if they stay with their batterers and deportation if they attempt to leave.

.... Under current law only the United States citizen or lawful permanent resident spouse is authorized to file a relative petition, and this spouse maintains full control over the petitioning process. He or she may withdraw the petition at any time for any reason. The purpose of permitting self-petitioning is to prevent the citizen or resident from using the petitioning process as a means to control or abuse an alien spouse.

H.R.Rep. No. 103–395, 1993 WL 484760, at *33, 42 (1993). As part of VAWA, Congress created new means of legal protections for battered immigrants aimed at offering greater protections and benefits than the 1990 battered spouse amendments. In particular, VAWA created a self-petitioning process for battered immigrants who are spouses of U.S. citizens or permanent residents. VAWA, Pub.L. No. 103–322, 108 Stat.1941–42.

The 1996 Mail–Order Bride Act, 8 U.S.C. § 1375, was the first attempt by Congress to regulate the mail-order bride industry. In enacting the 1996 Mail–Order Bride Act, Congress found that "mail order brides find themselves in abusive relationships." Id. at § 1375(a)(3). Congress also found the following:

Many mail order brides from the United States were ignorant of United States immigration law. Mail order brides who are battered often think that if they flee an abusive marriage, they will be deported. Often the citizen spouse threatens to have them deported if they report the abuse.

Id. at § 1375(a)(4).

The 1996 Mail–Order Bride Act required IMBs to make disclosures to female recruits about domestic remedies.

Each international matchmaking organization doing business in the United States shall disseminate to recruits, upon recruitment, such immigration and naturalization information as the Immigration and Naturalization Service deems appropriate, in the recruit's native language, including information regarding conditional permanent residence status and the battered spouse waiver under such status, permanent resident status, marriage fraud penalties, the unregulated nature of the business engaged in such organizations, and the study required under subsection (c) of this section.

8 U.S.C. § 1375(b)(1). The 1996 Mail–Order Bride Act provided a $20,000.00 civil penalty for international matchmaking agencies found to have violated the statute. See id. at (b)(2). The 1996 Mail–Order Bride Act also provided that the "Attorney General, in consultation with the Commissioner of Immigration and Naturalization and the Director of Violence Against Women Initiative at the Department of Justice

shall conduct a study of mail-order marriages to determine, among other things ... the extent of domestic abuse in mail-order bride marriages; and ... the need for ... expanded regulation ... to implement the objectives of the Violence Against Women Act ..." *See id.* at (c)(4) and (c)(5).

On July 16, 1997, the INS issued an Advanced Notice of Proposed Rulemaking to the IMB industry, which put the IMB industry on express notice that the United States government was considering additional regulation of the IMB industry to safeguard against domestic abuse. (Pl.'s Ex. 1, INS Report at p. 4.) In its Notice of Proposed Rulemaking, 62 Fed.Reg. 38041, the INS indicated its intent to promulgate regulations pursuant to the 1996 Mail–Order Bride Act, 8 U.S.C. § 1375, which itself already imposed regulations on IMBs (for example, requiring IMBs to tell all female recruits about domestic abuse remedies unique to foreign women). The INS Notice stated that the agency was considering "whether additional measures are needed to reduce the incidence of abuse" in relationships formed by IMBs. *Id.*

As referenced earlier, the INS prepared a report to Congress on abuses in mail-order bride relationships. (Pl.'s Ex. 1, INS Report.) This report was required under the 1996 Mail–Order Bride Act. (*Id.* at pp. 1, 4.) The report concluded that "with the burgeoning number of unregulated international matchmaking organizations and clients using their services, the potential for abuse in mail-order marriages is considerable," and that "an unregulated international matchmaking industry presents numerous opportunities for exploitation." (Pl.'s Ex. 1, INS Report at pp. 3, 5.) The report continued:

> These are relationships fostered by for-profit enterprises, where the balance of power between the two individuals is skewed to empower the male client who may be seen as 'purchasing' a bride and a woman who has everything to gain from entering into this arrangement and staying in it, no matter what the circumstances.

(*Id.* at p. 5.) The INS Report noted that the concern over this dangerous power imbalance is "not unique to the United States. Western Europe, Canada, and Australia are witnessing similar patterns with regard to the use of these agencies and the domestic violence that can result." (*Id.* at p. 2.) The INS Report drew distinctions between "mail-order bride" agencies and other means to initiate international correspondence relationships:

> Unlike dating services or personal ads, the mail-order bride transaction is 'one where the consumer-husband holds all the cards.' In using these services, the male customer has access to and chooses from a pool of women about whom personal details and information are provided, while the women are told virtually nothing about the male customer—or only what he chooses to reveal about himself.

(*Id.* at pp. 2–3.) The INS Report predicted that "Congressional response to this report may lead to additional steps in regulating the industry." (*Id.* at p. 5.) The report lists a number of general statutes and regulations that could be applied to IMBs in appropriate circumstances. (*Id.* at p. 10.) These laws are punitive, providing penalties or redress after harm has occurred, and not preventative of harm, which is IMBRA's purpose. The INS was unable to determine statistically valid estimates of abuse rates in "mail-order marriages" because of the limits of the administrative sources of information available to them. (*See id.* at pp. 6–7, 9.)

The study commissioned of Professor Robert Scholes by the INS that underlies

the INS Report, also referenced above, concluded:

> While no national figures exist on abuse of alien wives, there is every reason to believe that the incidence is higher in this population than for the nation as a whole. Authorities agree that abuse in these marriages can be expected based on the men's desire for a submissive wife and the women's desire for a better life. At some point, after the alien bride has had time to adjust to the new environment, to make new friends, and to become comfortable with the language, her new independence and his domination are bound to conflict.

(Pl.'s Ex. 2, Scholes Study at p. 6.) Scholes did not find that the international matchmaking industry contributed significantly to the problem of domestic violence involving foreign-born spouses (*id.* at 11), but the administrative sources of information again were very limited. The Scholes study concluded that problems of abuse in mail-order marriages required attention, and suggested that "potential husbands might need to be screened." (*Id.* at p. 8.) Scholes also urged that alien spouses be informed of their rights and resources be made available to them if they found themselves in trouble. (*Id.* at p. 9)

In addition to discussing "mail-order marriages" and domestic abuse, the INS Report noted possible connections between "mail-order marriages" and trafficking. Commenting on the "vast array of information" that existed on the subjects of "mail-order marriage" and domestic violence, including by trafficking experts, the report stated:

> This attention to mail-order marriages reflects growing concern regarding the global recruitment and transportation of women in a variety of exploitative ways. The information on trafficking suggests that mail-order brides may become victims of international trafficking in wom-

en and girls .... While not all mail-order brides would be considered trafficked, public policy is shifting to reflect the need to protect people from the exploitation and violence that results from all forms of trafficking.

(Pl.'s Ex. 1, INS Report at p. 1.) The INS Report also remarked:

> "A recent documentary produced by Global Survival Network (GSN) reveals how mail-order bride businesses are used as fronts to recruit and traffick Russian women to Germany, Japan, and the United States for the sex industry. Specifically, GSN reports that traffickers have become interested in sending women to the United States because fiancée visas are easily obtained."

(*Id.* at p. 3.)

In 2000, Congress passed the Victims of Violence and Trafficking Protection Act of 2000, the purpose of which is "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C. § 7101. The statute created two new forms of relief for battered immigrants—the T and U visas. The "T visa" is designed specifically for those who have been subjected to sex trafficking or other severe forms of trafficking in persons (e.g., involuntary servitude, peonage, debt bondage, or slavery). The "U visa" or "U nonimmigrant status" permits certain noncitizen crime victims who have suffered substantial mental or physical abuse as a result of the crime to be in the United States. Included in the enumerated crimes is domestic violence, regardless of marital status. In passing this legislation, Congress specifically found that "[v]ictims of trafficking are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been

trafficked [and] are often subjected to coercion and intimidation including physical detention and debt bondage, and ... often fear retribution and forcible removal to countries in which they will face retribution or other hardship." 22 U.S.C. § 7102. Consequently, "these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes." *Id.*

Encapsulated in the Victims of Violent and Trafficking Protection Act of 2000 was the reauthorization for VAWA, which was entitled "VAWA 2000." Congress found:

> [T]here are several groups of battered immigrant women and children who do not have access to the immigration protections of the Violence Against Women Act of 1994 which means that their abusers are virtually immune from prosecution because their victims can be deported as a result of action by their abusers and the Immigration and Naturalization Service cannot offer them protection no matter how compelling their case under existing law.

VAWA 2000 § 1502(a), 8 U.S.C. § 1101. In light of this finding, VAWA 2000 further refined and expanded the original VAWA to address some obstacles that had not come to the attention of the original VAWA drafters, or that had arisen from subsequent changes to immigration law.

In January 2001, the Department of State produced an advisory brochure, "Be Smart, Be Safe...," which targeted potential victims and warned that "mail-order bride" agencies, among other seemingly legitimate businesses, may actually be fronts for trafficking operations.[4]

IMBRA was initially introduced into the 108th Congress on July 25, 2003, by Rep. Rick Larsen (D–WA), together with Rep. Mark Kirk (R–IL) and Rep. Jay Inslee (D–WA) in the Senate. By the end of the 108th Congress, IMBRA had 17 co-sponsors in the House. Included among the Congressional findings made part of the 2003 bill, many of which have been noted *supra*, were the following:

(a) There is a substantial international marriage broker business worldwide;

(b) The total number of foreign fiancées entering the United States each year more than doubled between 1998 and 2002;

(c) The burgeoning number of unregulated international matchmaking organizations and clients using their services makes the potential for abuse in mail-order marriages considerable;

(d) American men who use the services of an international marriage broker tend to seek relationships with women whom they feel they can control;

(e) The dangers posed to foreign women who meet their American husbands through international marriage brokers are underscored by the growing number of cases across the United States of foreign women who have been abused or killed by those men;

(f) 30.4 percent of all women in the United States are physically abused by their husbands or male-cohabitants at some point in their lives; 49.3 percent of immigrants reported physical abuse by an intimate partner during their lifetimes with 41.2 percent reporting severe physical or sexual abuse;

(g) Among immigrants who were married or formerly married, the lifetime abuse rate raises as high as 59.5 percent;

---

**4.** Be Smart, Be Safe ... Don't Become a Victim of the Trade in People, *http://www. state.gov/p/inl/rls/fs/2001/jan/4229.htm* (last visited March 21, 2007).

(h) An estimated 72.3 percent of abusive United States citizen or lawful resident spouses never file immigration papers for their abused spouses and the 27.7 percent who eventually do file wait approximately four years to do so;

(i) Aliens seeking to enter the United States to marry citizens of the United States currently lack the ability to access and fully verify personal history information about their prospective American spouses;

(j) Many individuals entering the United States on K nonimmigrant visas to marry citizens of the United States are unaware of United States laws regarding -

(1) domestic violence, including protections for immigrant victims of domestic violence, sexual assault, and stalking;

(2) prohibitions on involuntary servitude;

(3) protections from automatic deportation; and

(4) the role of police and the courts in providing assistance to victims of domestic violence and other crimes.

(*See* Def.'s Exs. I–L.) A 2003 study by the TJC was also specifically cited in the findings provisions of the 2003 bill, and this study found that over 50 percent of legal and social services providers surveyed reported having served women who were abused by men they met through IMBs. (*See* Def.'s Ex. L at p. 3; Tr. at pp. 72–73.)

IMBRA was reintroduced in the 109th Congress on September 6, 2005, by Rep. Larsen and Rep. Frank Wolf (R–VA) and by Sen. Cantwell and Sen. Sam Brownback (R–KS) on September 7, 2005, in the Senate. By the end of December 2005, only four months after reintroduction, IMBRA had 15 co-sponsors in the House. Although refinements were made in the bill between its introduction in the 108th Congress and its reintroduction in the 109th Congress, including the requirement of additional criminal history disclosures (additional violent crimes, as well as prostitution and alcohol-related offenses), the essence of the disclosure requirements imposed on IMBs remained the same.

Over late Summer and early Fall 2005, Congress began to consider the reauthorization of the VAWA, with the House and Senate taking up difference versions of a bill to accomplish that purpose. On July 22, 2005, HR 3402 ("Department of Justice Appropriations Authorization Act") was introduced in the House of Representatives. HR 3402 incorporated provisions from IMBRA, requiring petitioners for fiancée visas to disclose any criminal convictions for domestic violence, sexual assault, or child abuse; placing limits on how many times and how frequently petitioners could sponsor fiancées; and mandating the creation of a pamphlet on the rights and resources of domestic violence victims. HR 3402 was referred to the Committee on the Judiciary, and reported out of Committee on September 27, 2005. *See* House Report 109–233, Sections 916(c) and 922. On September 28, 2005, HR 3402 passed the House by a vote of 415 to 4.

On June 8, 2005, S 1197 ("Violence Against Women Act of 2005") was introduced in the Senate. It was referred to the Committee on the Judiciary, and during Committee consideration on September 8, 2005, IMBRA was incorporated as Title VIII, Subtitle D. S 1197 was reported out of Committee on September 12, 2005. On October 4, 2005, S 1197 passed the Senate by unanimous consent. Thereafter, the House and Senate versions of these bills to reauthorize the Violence Against Women Act were "conferenced" to reconcile their differences. On December 16, 2005, IMBRA (as incorporated as Title VIII, Subtitle D of the Department of

**1368**

Justice and Violence Against Women Reauthorization Act of 2005 (the conferenced version of HR 3402)) was passed by the Senate by unanimous consent. The bill passed the House by voice vote. It was signed into law on January 5, 2006, and became Public Law No. 109–162.

IMBRA requires a U.S. petitioner applying to sponsor a foreign fiancée or spouse to report certain arrests and/or criminal convictions for violent crimes, including domestic violence, sexual assault, and child abuse. Section 833(d)(2)(A)(ii) requires the IMB to collect a certification signed by the United States client or an attestation concerning certain information regarding, without limitation, the following:

(1) temporary or permanent civil protection orders or restraining orders issued against the United States client; (2) arrests or convictions of the United States client for, inter alia, homicide, assault, domestic violence, sexual assault, torture, trafficking, kidnapping, or stalking; (3) arrests or convictions of the United States client for engaging in prostitution, attempting to procure prostitutes or persons for the purpose of prostitution, or receiving the proceeds of prostitution; (4) arrests or convictions of the United States client for offenses related to controlled substances or alcohol; (5)

marital history of the United States client; (6) the ages of any of the United States client's children who are under the age of 18; and (7) all States and countries in which the United States client has resided since the client was 18 years of age.

IMBRA prohibits an IMB from disclosing the "personal contact information"[5] of a foreign national client[6] to a United States client or representative without first obtaining the foreign national client's "informed consent." *See* Section 833(d)(3)(A). To obtain informed consent from a foreign national client, the IMB must first search the national or state sex offender registry for information regarding the United States client, collect background information of the United States client specified *supra*, provide to the foreign national client the information retrieved about the United States client, provide to the foreign national client an information pamphlet on legal rights and resources for immigrant victims of domestic violence, and receive from the foreign national client a signed written consent to release the foreign national client's personal contact information to the United States client. *See* 833(d)(3)(A).

IMBRA excludes from the definition of IMBs non-profit organizations and companies such as Match.com that operate do-

---

**5.** Section 833(e)(3) defines the term "personal contact information" as information, or a forum to obtain such information, that would permit individuals to contact each other, including:

(a) the name or residential, postal, electronic mail, or instant message address of an individual;

(b) the telephone, pager, cellphone, or fax number, or voice message mailbox of an individual; or

(c) the provision of an opportunity for an in-person meeting;

but does not include a photograph or general information about the background of interests of a person.

**6.** Section 833(e)(3) defines the term "foreign national client" as a person who is not a United States citizen or national or an alien lawfully admitted to the United States for permanent residence and who utilizes the services of an international marriage broker. Section 833(e)(3) further defines the term as including an alien residing in the United States who is in the United States as a result of utilizing the services of an international marriage broker and any alien recruited by an international marriage broker or representative of such broker.

mestic dating services where the principal business is not international matchmaking. Section 833(e)(4)(A) defines an IMB as follows:

(4) INTERNATIONAL MARRIAGE BROKER.—

(A) IN GENERAL.—The term "international marriage broker" means a corporation, partnership, business, individual, or other legal entity, whether or not organized under any law of the United States, that charges fees for providing dating, matrimonial, matchmaking services, or social referrals between United States citizens or nationals or aliens lawfully admitted to the United States as permanent residents and foreign national clients by providing personal contact information or otherwise facilitating communication between individuals.

In Section 833(e)(4)(B), the Act provides for two exceptions to this definition of IMB, including the following:

(i) a traditional matchmaking organization of a cultural or religious nature that operates on a nonprofit basis or otherwise operates in compliance with the laws of the countries in which it operates, including the laws of the United States; and

(ii) an entity that provides dating services if its principal business is not to provide international dating services between United States citizens or United States residents and foreign nationals and it charges comparable rates and offers comparable services to all individuals it serves regardless of the individual's gender or country of citizenship.

## CONCLUSIONS OF LAW

■ The standard for a permanent injunction is essentially the same as the standard for a preliminary injunction, except that the plaintiff must show actual success on the merits rather than a "likelihood of success" on the merits. *See, e.g.,*

*Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1097 (11th Cir.2004). Thus, a district court may enter a permanent injunction in this case only if European Connections shows (i) actual success on the merits; (ii) that European Connections would suffer irreparable injury absent issuance of an injunction; (iii) the threat of harm to European Connections outweighs harm that the proposed injunction may cause to other parties; and (iv) issuance of the permanent injunction is in the public interest. *See id.; Spottsville v. Barnes,* 135 F.Supp.2d 1316, 1318 (N.D.Ga.2001). European Connections has failed to meet its burden of demonstrating entitlement to a permanent injunction.

## I. Actual Success on the Merits

### A. *First Amendment Challenges*

European Connections has failed to demonstrate actual success on the merits with respect to its challenges under the First Amendment. The IMBRA statute affects IMBs' First Amendment rights, at best, at the margin. The statute neither bans nor completely suppresses commercial speech but rather imposes on European Connections and other IMBs certain disclosure requirements related to the backgrounds of its United States clients. That is, the IMBs simply transmit background data from their male clients to their female clients as a prerequisite to releasing the women's personal information, and the IMBs expressly do not vouch for the background information provided by the male clients.

■ A close review of IMBRA and an analysis of applicable First Amendment law brings the Court to the conclusion that IMBRA does not regulate the speech of IMBs such as European Connections. "Commercial speech" entitled to First Amendment protection is limited to communications about the availability and

1370

characteristics of products and services, and communications which are intended to propose a commercial transaction. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (holding that activities "not primarily concerned with providing information about the characteristics and costs of goods and services" are not commercial speech). Commercial speech—statements made by an advertiser about the qualities or characteristics of its own, or another's, products or services—does not encompass every communication related to commerce. *See id.*

In the instant case, IMBRA does not regulate commercial speech. IMBs are not restricted from touting their services. Nowhere in the IMBRA statute are there any provisions attempting to regulate the content of IMBs' commercial messages in which they tout their respective services in an attempt to induce commercial transactions. Instead, IMBRA requires the IMBs merely to perform a transmittal role. This is not commercial speech.

■ Merely because an activity is "carried out by means of language, either spoken, written, or printed," does not mean that the First Amendment applies. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Congress regulates numerous communicative activities without implicating the First Amendment at all, including "the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees." *Id.* at 456, 98 S.Ct. 1912 (citations omitted).

"Each of these examples illustrates that the State does not lost its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.*

In establishing limited First Amendment protection to commercial speech, the Supreme Court has explained that "[a]dvertising, though entirely commercial, may often carry information of import .... [C]ommercial speech serves to inform the public of the availability, nature, and prices of products and services .... [and therefore assures] informed and reliable decisionmaking." *Bates v. State Bar of Arizona,* 433 U.S. 350, 381, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). "Robust debate between competitors on matters of opinion, and claims that one product or service is far superior to that of rivals, are encouraged as part of the hurley-burley inherent in a free market system, and indeed an open society." *Licata & Co. v. Goldberg,* 812 F.Supp. 403, 408 (S.D.N.Y.1993). The Supreme Court has been particularly suspicious of content-based regulations that restrict or prohibit commercial speech. *See, e.g., 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 497, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (explaining that the Supreme Court had previously reasoned that the "paternalistic assumption that the public will use truthful, nonmisleading commercial information unwisely cannot justify a decision to suppress it").

■ Here, as mentioned *supra,* IMBRA does not prohibit European Connections or any other IMB from explaining the attributes of its service or distinguishing itself from commercial rivals or doing anything to explain to "the public" information about the availability of products and services. Instead, IMBRA conditions the IMBs' release of personal information from one individual client to another individual client without informed consent.

Thus, IMBRA regulates a part of a commercial transaction that does not involve any advertising or commercial claims but instead concerns the release of private information in order to protect the health and safety of foreign women. Upon closer consideration of the facts of this case and the arguments presented by the parties, there simply is not a credible argument that the rationales forming the basis for the commercial speech doctrine are present with regard to IMBRA's background check provision.

█ Even if IMBRA arguably regulates speech, European Connections' First Amendment speech interest is an interest in commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561, 100 S.Ct. 2343. "Commercial speech generally enjoys a more limited measure of protection and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1569 n. 3 (11th Cir.1993) (quoting *Ohralik*, 436 U.S. at 456, 98 S.Ct. 1912). Where a governmental regulation that has the effect of banning or completely suppressing commercial speech is challenged, a court is required to determine: (1) whether the speech concerns lawful activity and is not misleading; (2) whether the regulation serves a substantial governmental interest; (3) whether the regulation directly and materially advances the state's asserted interest; and (4) whether the regulation is no more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 564–66, 100 S.Ct. 2343.

While *Central Hudson* generally applies in the commercial speech context, the United States Supreme Court has distinguished between outright bans on commercial speech and disclosure requirements, holding that diminished First Amendment scrutiny is all that is required with respect to the latter. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 n. 14, 105 S.Ct. 2265, 85 L.Ed.2d 652(1985) ("Because the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed, we do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized."); *see also Borgner v. Brooks*, 284 F.3d 1204, 1214 (11th Cir.2002) (noting that courts have been more tolerant of regulations mandating disclosures than they have been of regulations that impose a total ban on commercial speech). Therefore, notwithstanding that the Court applied the *Central Hudson* analysis in issuing the temporary restraining order, the Court is persuaded by the arguments of Defendants and Defendant–Intervenor that the strict "least restrictive means" analysis set forth in *Central Hudson* is inapplicable to the challenge to IMBRA.[7] Rather, IMBRA's disclosure requirements are properly analyzed under *Zauderer* and must be upheld if there is a reasonable relationship to a legitimate governmental interest.

IMBRA's disclosure requirements certainly satisfy the *Zauderer* standard. The State's asserted interest here is in protecting female clients of IMBs from fraud, deception, and abuse by the United States

---

**7.** Even if the *Central Hudson* test applies in this case, Defendants have presented persuasive arguments as to why IMBRA would pass muster under that analysis. (*See* Defendants'

Memorandum Opposing Preliminary Injunction at pp. 16–20.) The Court agrees fully with those arguments.

male clients who utilize IMBs to market themselves as desirable mates. This interest constitutes a legitimate governmental interest, which is advanced by the disclosure requirements, notwithstanding that IMBs likely will not be able to verify the accuracy or completeness of the information provided to them by the United States male clients.[8] While several categories of information are required to be disclosed under IMBRA, there is, as demonstrated by the defense exhibits and expert testimony, a reasonable relationship between each category of information requested and the harms which IMBRA seeks to address. Plaintiff has not challenged all categories of information required to be disclosed. However, none of Plaintiff's challenges has merit. IMBRA's disclosure requirements are reasonably related to Congress' legitimate interest in preventing fraud and deception and addressing domestic abuse and human trafficking against so-called "mail-order brides."

Plaintiff argues that IMBRA is "completely overbroad" because it requires disclosure of "arrest" records and that an arrest does not mean that a person is "guilty." Plaintiff's argument is flawed in several significant respects. First, numerous statutes and regulations require disclosure of arrest records. As pointed out by TJC, disclosure of arrests is often required in order to obtain a job in public school systems. *See, e.g.,* Dougherty County School System Application for Employment, available at http://www.dougherty.k 12.ga.us/PDFs/apppacks/app_pack_ noninst.pdf (last visited March 22, 2007). Individuals who wish to become members of a public security exchange must comply

with Securities and Exchange Commission requirements by disclosing on a questionnaire whether they have a "record of any arrest or indictment for any felony, or any misdemeanor pertaining to securities, commodities, banking, insurance or real estate ... fraud, false statements or omissions, wrongful taking of property or bribery, forgery, counterfeiting, or extortion." 17 C.F.R. § 240.17a–3. The federal government also requires the military to acquire, review, and keep criminal history record information, including arrests, of all recruits. *See* C.F.R. § 96.5. The United States Equal Employment Opportunity Commission has acknowledged that records of mere arrest can be valuable evidence of prior conduct upon which an adverse employment decision may be made: "As with conviction records, arrest records may be considered in the employment decision as evidence of conduct which may render an applicant unsuitable for a particular position." United States E.E.O.C., *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964,* available at 1990 WL 1104708, at *2.

Contrary to Plaintiff's intimations, arrest records are not private or protected information. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), for example, the police distributed fliers to area stores alerting them to possible shoplifters during the holiday shopping season. *Id.* at 694–95, 96 S.Ct. 1155. The fliers printed the name and mug shot of the plaintiff who had been arrested, though not yet convicted, for shoplifting. *Id.* Shortly after the distribution of the fliers,

---

**8.** According to the expert witness, Ms. Smoot, "the pamphlet that is meant to accompany the information that [the IMB] provides that would be officially compiled by the U.S. Government Department of Justice, Department of Homeland Security and the Department of State, contains a qualifier saying precisely

that the criminal background information may not be complete, that a man who is abusive may not have a criminal record demonstrating that, and that they may have [sic] not have fully disclosed information on their forms." (Tr. at pp. 84–85.)

the shoplifting charges against the plaintiff were dismissed. *Id.* at 696, 96 S.Ct. 1155. The Supreme Court denied the challenge to publication of official acts like arrest records, notwithstanding the lack of a finding of guilt. *Id.*

Courts generally have held that there is no right to keep arrest records confidential because they are public reports. *See, e.g., Paul P. v. Verniero,* 170 F.3d 396, 403 (3d Cir.1999) (holding "specifically that arrest records and related information are not protected by a right to privacy"); *Cline v. Rogers,* 87 F.3d 176, 176 (6th Cir.1996) (finding no privacy right in one's arrest record because "arrest and conviction information are matters of public record"); *Fraternal Order of Police v. City of Philadelphia,* 812 F.2d 105, 117 (3d Cir.1987) (same).

In *City of Philadelphia,* the court upheld the constitutionality of the city's use of a questionnaire used to select applicants for a special investigations unit that asked for information concerning any arrests of the police officers' family members. 812 F.2d at 117. The court noted that "[a]rrest records are not exempted from the Freedom of Information Act, and even investigatory records prepared prior to arrests are accorded only limited protection." *Id.* (citing 5 U.S.C. § 552(b)(7)). In upholding the city's requirement that the applications provide this information, the court also found that "it is unlikely that anyone could have a reasonable expectation that an arrest will remain private information . . . ." *Id.*

European Connections has claimed in this litigation that information regarding "arrests" is not reliably connected to Congress' remedial purpose (to avoid or minimize instances of domestic abuse) because the person can be arrested for a violent crime that he did not commit. However, the TJC expert testified that domestic abuse is often not prosecuted because the victim is fearful and unwilling to cooperate with law enforcement and prosecuting attorneys:

... domestic violence situations very rarely result in a report, and very rarely result in an arrest. Sometimes once upon arrest, can't go forward to conviction because either she won't cooperate with the prosecutor or the way that the domestic violence statutes are written .... where we don't always have in our society, sadly, the information to identify a potential batterer because of the way his history may be coming up, a violence history is a fair proxy for it.

(Tr. at 80–81.) In addition, a number of states do not have a separately chargeable crime of domestic violence. (*Id.* at pp. 80.) A study by the Urban Institute has found that a high percentage of domestic violence-related incidents were charged at arrest as assault and battery crimes, with no particularized markers indicating domestic violence. The study shows similar results regarding assault and battery convictions. (Tr. at 79–80.) There simply is no constitutional infirmity in requiring the disclosure of arrest information.

Plaintiff has vaguely complained that an American man's history of substance abuse or prostitution cannot be linked to domestic abuse and that IMBRA is therefore overbroad in requiring disclosure of information related to these subjects. However, there is evidence to substantiate the link between substance abuse and prostitution on the one hand and domestic abuse on the other. A Health and Human Services report provided to Congress in 1993 documented a strong correlation between alcohol and substance abuse and domestic violence. (Tr. at pp. 81–82; *see also* U.S. Dept. of Health and Human Services, Substance Abuse and Mental Health Services Administration, "Experts Assess Links Between Substance Abuse and Domestic

Violence," (news release dated January 21, 1998)). Moreover, one reason why IMBRA requires the disclosure of prostitution-related offenses is that such questions are asked on the non-immigrant visa petition and such offenses are a ground of inadmissibility under the Immigration and Nationality Act. (Tr. at p. 76.) Prostitution-related disclosures are also mandated under IMBRA to ascertain information which is potentially relevant to the issue of human trafficking. (*See* Pl.'s Ex. 1, INS Report at p. 1.) Congress rationally may use these "indicators" (i.e., arrests, substance abuse, prostitution) of domestic abuse potential, particularly given that domestic abuse is so underreported and, when it is reported, it rarely results in prosecutions and convictions.

■■■ Arguing still that a more restrictive analysis is appropriate, Plaintiff apparently seeks to assert the noncommercial speech interests of its clients. In this regard, Article III's case or controversy requirement generally requires a litigant in federal court to establish its own injury in fact and not the rights of others not before the court. *See Laird v. Tatum,* 408 U.S. 1, 14 n. 7, 92 S.Ct. 2318, 2326 n. 7, 33 L.Ed.2d 154 (1972). "Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (quoting *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)). " 'Substantial overbreadth' is a criterion the Court has invoked to avoid striking down a statute on its face simply because

of the possibility that it might be applied in an unconstitutional manner. It is appropriate in cases where, despite some possibly impermissible application, the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . .'" *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 965, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (quoting *CSC v. Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)). "[T]he overbreadth . . . must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Dimmitt,* 985 F.2d at 1571. A party asserting the substantial overbreadth doctrine cannot rest his argument on mere speculation, but must demonstrate a "realistic danger that the ordinance will significantly compromise recognized First Amendment protections of parties not before the Court." *Regan v. Time, Inc.,* 468 U.S. 641, 652 n. 8, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)). "[A] prediction cannot . . . justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

This Court finds that the only evidence offered by Plaintiff in support of its overbreadth argument is the opinion of its President, Preston B. Steckel, that "[j]ust the requirement of asking for such information [under IMBRA] will cause potential clients to not use our company," which, presumably, is asserted by Plaintiff as constituting a chilling effect on speech. (Tr. at pp. 48–49; Steckel Declaration ¶ 16.) Mr. Steckel's opinion is an insufficient basis upon which to establish a "realistic danger that the ordinance will significantly

compromise recognized First Amendment protections of parties not before the Court." *Regan*, 468 U.S. at 652 n. 8, 104 S.Ct. 3262. Rather, it is speculation which the Supreme Court has found "cannot ... justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908. Plaintiff has failed to carry its burden of establishing that "in relation to the statute's plainly legitimate sweep," IMBRA is substantially overbroad in violation of European Connections' First Amendment rights or those of its clients. *Dimmitt*, 985 F.2d at 1571.

■ IMBRA also is not an impermissible, content-based regulation that compels speech, to the extent speech is even compelled. This Court has found that "[a] compelled speech requirement is constitutional if (1) there is a substantial state interest, such as preventing deception or confusion of consumers, (2) to which the compelled speech requirement is reasonably related, and (3) the requirement is not unjustified, or unduly burdensome." *Tillman v. Miller*, No. 1:95–CV–1594–CC, 1996 WL 767477 (N.D.Ga. Sept.30, 1996).

As set forth above, the Court has already found that there is a substantial governmental interest to which the compelled speech requirement is reasonably related. Further, for the following reasons, the Court finds that IMBRA's requirements are not unjustified or unduly burdensome. European Connections concedes that it does not collect the postal addresses of its female clients, collects telephone numbers and e-mail addresses from only 20 percent of its female clients, and does not generally disclose the personal contact information of its female clients. (Tr. at pp. 35–36.) The only exception to European Connections' privacy policy is that, in connection with its telephone intro-

duction service, European Connections sometimes furnishes, with the permission of the participating female client, a woman's telephone number. (Tr. at pp. 19–20; Def.'s Ex. C.) IMBRA's non-disclosure requirement is therefore generally consistent with European Connections' current business practice. European Connections employs at least eight individuals on its staff who serve as translators or interpreters in connection with European Connections' various services and has business relationships with 200 to 250 Russian matchmaking agencies that also provide translation in connection with European Connections' services. (Tr. at pp. 16–21.) As such, IMBRA's requirement that certain information be disclosed in the foreign client's primary language is consistent with the similar translation services currently provided by European Connections, either directly or indirectly, to its foreign clients. The vast majority of information that European Connections is required to collect under IMBRA requirements is self-disclosed by the United States client and may be collected by electronic means. The collection of this information, therefore, has not been shown to impose an undue burden on European Connections. IMBRA's requirement that an IMB perform a search of National Sex Offender Public Registry, or of the relevant State sex offender public registry, for information regarding the United States client, may largely be accomplished by a free, computer search of the Justice Department's website at http://www.neopr.org. (Tr. at p. 78.) The Court finds this requirement is not unduly burdensome. Finally, the pamphlet that IMBRA requires to be provided is developed by the Secretary of Homeland Security and the requirement is substantially the same as the one imposed by IMBRA's predecessor act, the 1996 Mail–Order Bride Act, formerly found at 8 U.S.C. § 1375. This requirement, there-

fore, does not impose any greater burden on European Connections than it is currently under.

▮ Furthermore, to the extent that European Connections has a valid speech interest in the personal contact information of its male and female clients, IMBRA does not restrain that interest because European Connections' general practice is not to communicate such information. Mr. Steckel specifically avers in his declaration, albeit somewhat untruthfully, that European Connections never releases contact information of any of its male or foreign female clients.[9] (Steckel Declaration ¶ 4.) The Act, therefore, does not restrain or regulate speech or conduct in which Plaintiff seeks to engage. *See Graham v. Butterworth*, 5 F.3d 496, 500 n. 3 (11th Cir.1993) ("Because the challenged statute does not regulate the conduct that the appellants intend to engage in, they do not have standing to raise an overbreadth challenge to the statute."). Plaintiff's arguments that IMBRA constitutes a "prior restraint" on constitutionally protected speech, a "content-based" restriction of First Amendment protected speech, or an unconstitutional regulation of "commercial speech" are without merit.

## B. *Equal Protection Challenge*

▮ European Connections claims that the express definition of IMBs violates the equal protection clause because it excludes religious and cultural organizations and organizations that do not target American man-foreign woman relationships as the principal part of its business. To prove an equal protection violation under the Fifth Amendment, Plaintiff must prove that similarly situated people have been treated differently by a governmental entity without adequate justification. *See,*

e.g., *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Strict scrutiny is applied to classifications that have been held by the Supreme Court to be suspect or where a fundamental right is involved. *See, e.g., Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (race); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of a uniquely private nature); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (right to vote); *Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). With quasi-suspect classifications, such as gender or legitimacy, the government must show that "the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *United States v. Virginia*, 518 U.S. 515, 516, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)); *see also Clark v. Jeter*, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). All other classifications are reviewed under the "rational basis test" and will be upheld unless they bear no rational relationship to any conceivable governmental interest. *See, e.g., Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) (citing *Heller v. Doe*, 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)); *see also Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th Cir.2002); *Price v. Tanner*, 855 F.2d 820, 828–30 (11th Cir.1988).

**9.** As stated *supra*, in connection with its telephone introduction service, European Connections sometimes furnishes, with the permission of the participating female client, a woman's telephone number.

Neither the definition of IMB found in IMBRA nor the exemptions involve suspect or quasi-suspect classifications, and the Court must therefore uphold the definition and its exemptions unless European Connections can prove that the definition and its exemptions bear no rational relationship to any conceivable governmental interest. This Court's review of European Connections' equal protection challenge is strictly limited to determining whether Congress had "any reasonably conceivable state of facts [that] could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir.2005) ("A statute is considered constitutional under the rational basis test when there is any reasonably conceivable state of facts that could provide a rational basis for it."). "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096. Thus, if there are any "plausible reasons for Congress' actions, the inquiry is at an end." *Id.* at 313–14, 113 S.Ct. 2096 (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)).

Because the distinctions within IMBRA that determine whether a dating service is covered by the Act are presumed to be constitutional, European Connections has "the burden to negative every conceivable basis which might support" the rationality of IMBRA's classification scheme. *Id.* European Connections' burden is considerable.

[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. Thus, the absence of 'legislative facts' explaining the distinction ... has no significance in rational-basis analysis. In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.

*Id.* at 315, 113 S.Ct. 2096 (citations omitted); *see also Georgia Cemetery Ass'n, Inc. v. Cox*, 403 F.Supp.2d 1206, 1210 (N.D.Ga.2003) (same). Thus, European Connections cannot prevail by showing that the distinction drawn by IMBRA is not supported by sufficient data or research; nor may European Connections prevail by arguing, as it did at the evidentiary hearing, that Congress is required to investigate the validity of sociological evidence presented to it before legislating in that field. Rather, European Connections must affirmatively prove that Congress acted arbitrarily and irrationally. In contrast, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe by Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

IMBRA exempts from its regulatory scheme two categories of matchmaking businesses: (1) "traditional matchmaking organizations of a cultural or religious nature that operate[ ] on a nonprofit basis;" and (2) those businesses whose "principal business is not to provide international dating services ... and [that] charge[ ] comparable rates and offer[ ] comparable services to all individuals regardless of the individual's gender or country of citizenship." 119 Stat. 3075. European Connections argues that Congress had no rational basis for carving out these exemptions, especially for large online dating companies such as "Match.com" whose "principal business is not to provide international dating services between United States citizens ... and foreign nationals *and* charge comparable rates and offer [ ] comparable

1378

services to all individuals it serves regardless of the individual's gender or country of citizenship." 119 Stat. 3075. European Connections also complains that Congress had no basis to carve out an exception for non-profit cultural or religious matchmakers. However, there clearly exists in this case a rational basis for distinguishing between IMBs, as defined by IMBRA, and the entities excepted from that definition.

■ The evidence before Congress was that commercial, for-profit IMBs contributed to the growing problem of domestic violence against particularly vulnerable foreign women. (*See, e.g.,* Pl.'s Ex. 1, INS Report at p. 5.) At trial, Ms. Smoot testified that Congress was specifically concerned with for-profit enterprises whose incentives were skewed to disregard women's safety. (Tr. at pp. 70–71, 107–115.) Ms. Smoot explained that the companies are more concerned with the satisfaction of the men "who are the paying customers over safeguarding female customers." (*Id.* at p. 109.) Ms. Smoot further explained the absence of a profit-motive removes many of the incentives for a marriage agency to prefer the male client's satisfaction over the female client's safety and discourages the male's sense of "ownership" over his imported bride, thus reducing potential for domestic abuse. (Tr. at 113.) There is thus a rational basis for IMBRA's distinction between for-profits and non-profits. *See Ad–Express, Inc. v. Kirvin,* 516 F.2d 195, 197–98 (2d Cir.1975) ("there is a rational basis for distinguishing between advertising materials distributed for profit and materials distributed by charitable or non-profit organizations"); *Lykins v. Hohnbaum,* 2002 WL 32783973, at *5 (D.Or.2002) (legislative classification based on non-profit/for-profit entity upheld); *Thurmond v. Block,* 640 F.Supp. 588, 594 (W.D.Tenn.1986) (same).

Cultural and religious non-profits are not targeted by IMBRA for regulation because, like non-profits, such entities lack the same customer-centric motivation that commercial IMBs possess. Congress reasonably could assume that without the motivation to keep its male customers satisfied, traditional religious and cultural matchmaking agencies are not as likely to be complicit in developing abusive relationships. Furthermore, Congress simply had no statistical or other evidence that traditional cultural or religious marriage brokers contribute significantly to the harms Congress seeks to address—domestic abuse and human trafficking.

Congress also rationally distinguished between those dating services that charge comparable rates and offer comparable services to both the American men and the foreign women. Congress was particularly concerned with companies that collected their membership fees from men and not from women. This distinction characterizes the IMBs, where the man pays and the woman typically is the "commodity." This is different from Match.com and similar of domestic matchmaking services where men and women pay equally to participate in the service. Congress was concerned with the power imbalance that results in a business model where the American male pays for services, but the woman does not. As a report from the INS to Congress put it, "[u]nlike dating services or personal ads, the mail-order bride transaction is 'one where the consumer-husband holds all the cards.' " (Pl.'s Ex. 1, INS Report at pp. 2–3.) The INS explained: "These are relationships fostered by for-profit enterprises, where the balance of power between the two individuals is skewed to empower the male client who may be seen as 'purchasing' a bride and a woman who has everything to gain from entering into this arrangement and staying in it, no matter what the circumstances." (*Id.* at p. 5; Tr. at 125–26.)

European Connections' testimony that internet dating sites such as Match.com, Yahoosingle.com, and Friendfinders.com have many more females says nothing about the effects of such sites on domestic violence or human trafficking against so-called "mail order brides." Furthermore, European Connections concedes, and the Court finds, that such internet dating sites do not offer the broad range of services that IMBs such as European Connections does, which include K-1 visa counseling and attorney referral services, interpreter-assisted e-mail and telephone introduction services, and travel-related services. (Tr. at p. 33.) Ms. Smoot testified that IMBs offer substantial "add-on services." Once again, these add-on services often are offered only to the men. (Tr. at p. 112.)

The distinction between those dating services whose principal business is providing international dating services as opposed to domestic services is clear. Congress sought not to regulate all dating services but to protect foreign women, who it found to be particularly vulnerable to harm from this industry, from potentially violent American men. Congress rationally sought to regulate only those businesses whose main function is to facilitate these international matches, rather than painting all dating services with a broad brush. European Connections is on one side of the regulatory line established by Congress, while other dating services like Match.com fall on the other based upon the different focus of their business models.

"Defining the class of persons subject to a regulatory requirement ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Beach Com-* *munications,* 508 U.S. at 315–16, 113 S.Ct. 2096. Congress was entitled to draw a line between those entities that specialize in international matchmaking and those where foreign introductions are merely incidental. *Cf. City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 52–53, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (upholding ordinance which reflected city's choice to "address the potential problems created by one particular kind of adult business" without regulating others).

Moreover, even if the harms Congress sought to address exist with dating services that incidentally provide international matchmaking services, the statute's failure to bring these organizations within its reach does not offend the Constitution. "[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *see also Califano v. Jobst,* 434 U.S. 47, 57, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) (Social Security disability marriage rule); *City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam) (grandfathered pushcart vendors).

Courts have consistently upheld regulations that make distinctions between similar or overlapping businesses. *See, e.g., Fitzgerald v. Racing Ass'n of Central Iowa,* 539 U.S. 103, 108–09, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) (holding that Iowa statutes taxing riverboat slot machines at 20 percent rate but racetrack slot machines at 36 percent rate did not violate equal protection by treating businesses differently); *Spudich v. Smarr,* 931 F.2d 1278, 1281 (8th Cir.1991) (Missouri legislature could rationally differentiate between family oriented sports facilities such as

bowling alleys and soccer stadiums and facilities such as billiards parlors and, thus, did not violate equal protection when it allowed Sunday sales of intoxicating liquors at bowling alleys and soccer stadiums, but not at billiards parlors); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1279 (5th Cir.1988) (city ordinance imposing licensing and zoning restrictions on certain sexually oriented businesses, including topless bars, did not deny topless bar owners equal protection merely because the ordinance did not regulate adult bookstores and theaters, which were specifically exempt from state enabling act allowing city to regulate certain sexually oriented businesses); *DLS, Inc. v. City of Chattanooga*, 894 F.Supp. 1140, 1149 (E.D.Tenn.1995) (city ordinance providing for regulation of adult-oriented establishments did not violate equal protection on ground that it did not target other sources of sexual displays such as cable television, adult magazines, adult books, sexual stimulation devices, and pornographic movies); *Top Shelf, Inc. v. Mayor and Aldermen for City of Savannah*, 840 F.Supp. 903, 907 (S.D.Ga.1993) (municipal ordinance barring nude dancing in establishments licensed to serve alcoholic beverages did not violate equal protection clause by differentiating between mainstream and non-mainstream performances, with non-mainstream defined as "legitimate" plays, operas, etc. in which less than 20 percent of the venues gross receipts are from the sale of alcohol, as such distinction was rationally related to city's legitimate interest on health, safety, and welfare).

The reasons set forth above for the distinctions between IMBs and other dating services or matchmaking organizations are rationally related to governmental interests advanced by IMBRA, and European Connections has not carried its burden to negate them. It is not enough for European Connections to snipe at the evidence presented to Congress demonstrating this power imbalance. Congress is permitted to legislate on nothing more than "rational speculation." *Beach Communications*, 508 U.S. at 315, 113 S.Ct. 2096. Thus, after full consideration of the evidence presented, the Court finds that there clearly is a rational basis for IMBRA's definition of IMB and the exceptions thereto and that European Connections' Fifth Amendment right to equal protection is therefore not violated. The distinctions between types of entities drawn by IMBRA are constitutionally valid.

## II. Irreparable Harm

■ European Connections also has failed to show that it will suffer irreparable harm. The fact that European Connections must comply with government regulations is not evidence of "irreparable harm." The IMB industry has been on notice for a decade that Congress was considering substantial regulation of this industry. *See, e.g.*, 62 Fed.Reg. 38041 (notice of IMB rulemaking). European Connections' only evidence that it would suffer harm under IMBRA is the conclusory and speculative testimony of Plaintiff's president, who predicted that "just the requirement of asking for such [background] information will cause potential clients not to use our company." (Steckel Declaration ¶ 16.) However, just as the requirement to provide background information as a prerequisite to purchasing a firearm has not put gun manufacturers out of business, there is no reason to believe that IMBs will be driven from the marketplace by IMBRA. *See SEG Sports Corp. v. State Athletic Comm'n*, 952 F.Supp. 202, 204–05 (S.D.N.Y.1997) (speculative evidence of irreparable harm is not sufficient to obtain injunctive relief).

The only individuals who may no longer use IMBs under IMBRA are those American men who have a significant history of violence toward women—the very type of

person that Congress is concerned about. Thus, to the extent that any men will be driven from the IMB market, it will effectuate Congress' remedial purpose. If Congress is successful in reducing abuses in the IMB industry, the industry may actually grow. This scenario is just as likely than the doomsday scenario that Plaintiff suggests.

 In any event, "economic loss ... does not constitute a first amendment injury. 'The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of [an] ordinance upon freedom of expression.'" *Warner Cable Communications, Inc. v. City of Niceville,* 911 F.2d 634, 638 (11th Cir.1990), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976) (Powell, J., concurring)). Thus, although IMBRA may drive some men away from the IMB market, this does not in itself amount to a violation of the First Amendment rights of European Connections or any other IMBs. Plaintiff has failed to prove that it would face imminent and irreparable harm under IMBRA.

## III. Balance of the Harms

 IMBRA is highly likely to reduce domestic abuse—and may actually save lives. The health and safety of foreign women that IMBRA seeks to protect substantially outweighs any pecuniary harm that IMBRA may cause to some IMBs. When balancing the harms in this case, the Court is confronted with the classic "blood-versus-money" analysis, and the safety of foreign women coming to the United States clearly is the more vital interest.

## IV. Public Interest

 In this case, the public interest has been vindicated—through the public's representatives in Congress—through the enactment of IMBRA. The public has a keen interest in having its representatives enact legislation to protect women from domestic violence, and the public also has an interest in avoiding the wisdom of such legislation second-guessed in a judicial forum. Domestic abuse is a significant public concern, and the public interest will be vindicated by denying Plaintiff's request for a permanent injunction that would bar the enforcement of IMBRA.

## *CONCLUSION*

Based on the findings and conclusions set forth above, the Court DENIES Plaintiff's request for preliminary and permanent injunctive relief. All motions presently pending on the Court's docket are DENIED as moot. The Court DISMISSES Plaintiff's Complaint with prejudice and DIRECTS the Clerk of Court to mark this case closed.